**In re WELLINGTON APARTMENT, LLC, Debtor.**

**Wellington Apartment, LLC, Plaintiff,**

**v.**

**Charles H. Clotworthy, III, et al., Defendants.**

**Bankruptcy No. 04–50301–DHA.
Adversary No. 05–5029.**

United States Bankruptcy Court,
E.D. Virginia,
Newport News Division.

Aug. 24, 2006.

John M. Ryan, Jr., Karen M. Crowley, Marcus, Santoro & Kozak, P.C., Chesapeake, VA, for Plaintiff.

Michael L. Donner, Sr., Weinberg & Stein, R. Clinton Stackhouse, Jr., Stackhouse, Nexsen & Turrietta, Douglas M. Foley, McGuireWoods LLP, Peter G. Zemanian, Zemanian Law Group, Norfolk, VA, Benjamin C. Ackerly, Jason William Harbour, Hunton & Williams LLP, Richmond, VA, for Defendants.

### AMENDED MEMORANDUM OPINION AND ORDER

DAVID H. ADAMS, Bankruptcy Judge.

This matter is before the Court on the Complaint of Wellington Apartment, LLC ("Wellington," "Plaintiff" or "Debtor") against Charles H. Clotworthy, III ("Clotworthy"), Richard Merel ("Merel"), Steven Byers ("Byers"), Garfield & Merel, Ltd. ("G & M"), WP New Orleans, L.L.C. ("WP New Orleans"), and WPN, L.L.C. ("WPN"),[1] (collectively referred to as "the defendants"). The facts and issues involved in this matter are extremely complicated because of the parties' actions. While the complaint alleges eleven causes of action against the defendants, they all boil down to one ultimate question: did the defendants deprive the debtor of $1,615,000 in assets by fraudulently eliminating the debtor's interest in real proper-

---

1. The Complaint included Poydras (Louisiana), LLC ("Poydras Louisiana") and Marc New Orleans, LLC ("Marc New Orleans") as defendants, but the Plaintiff ultimately settled its case against both of those defendants prior to trial; therefore they will not be addressed herein.

ty located in New Orleans, Louisiana? After making our way through the labyrinth of facts in this case, this Court makes the following Findings of Fact and Conclusions of Law.

This is a core proceeding over which this Court has jurisdiction under 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## I. FINDINGS OF FACT

This case is very fact specific and, unfortunately, as stated above, the underlying facts are quite convoluted; the Court has attempted to organize them in the most efficient manner possible.

To begin the confusion in this case, there are two different Wellington entities, Wellington Apartments, LLC, organized in Connecticut ("Wellington CT") and Wellington Apartment, LLC, organized in Virginia ("Wellington VA"). The only difference in the names of the entities is the "s" at the end of the word "Apartment" in the Connecticut company. Wellington CT is owned equally by Hamilton Apartments, LLC and AR Investments, LLC.[2] Wellington VA is owned equally by N.I. USA, LLC and Woodland Holding, LLC. N.I. USA, LLC is owned by Ran Nizan ("Nizan") and his wife and Woodland Holding, LLC is owned by Nizan's father and his father's business partner. Nizan is the manager of both Wellington entities and both share Nizan's home address in Danbury, Connecticut. (Tr. 77).

2. It is unclear who owns AR Investments, LLC; Cohen testified that he and Ran Nizan each owned 50% of that entity (Tr. p. 721), but Nizan's personal bankruptcy schedules and his testimony indicate that N.I. USA and Cohen were equal partners in that venture. (Tr. p. 305, Def.Ex.AH). It is not known who owns Hamilton Apartments, LLC.

3. This conversion was prompted by the court's issuance of an Order to Show Cause.

## A. *Procedural History*

On November 13, 2002, Wellington CT filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the District of Connecticut, Bridgeport Division. The case was converted to one under Chapter 7 of the Code with Wellington CT's consent on January 23, 2003,[3] and was transferred to the Eastern District of Virginia, Newport News Division on December 10, 2004, at the request of First Bank & Trust Company of Illinois ("First Bank"), an alleged creditor in that case. The term "alleged" is used because there was a dispute over the enforceability of the note payable to First Bank, as well as questions regarding the ownership of the property pledged as collateral for the loan; Wellington CT's schedules state that the signature on the note is a forgery. It appears, however, that these issues have been resolved in the litigation described below between First Bank and Wellington VA.

On January 5, 2004, Wellington VA also filed for relief under Chapter 11 of the Code in the District of Connecticut, Bridgeport Division, and its case was transferred to the Eastern District of Virginia, Newport News Division, on February 3, 2004.[4] The only asset of Wellington VA was a 152-unit apartment complex located in Newport News, Virginia.

On May 12, 2004, First Bank & Trust Company of Illinois filed an adversary pro-

4. This case was filed pro se by Ran Nizan as the debtor's designee, and listed the debtor's name as Wellington Apartments, LLC, identical to that of Wellington CT. The name was corrected to Wellington Apartment, LLC by an Amended Petition that was filed on March 4, 2004, by Karen Crowley, counsel for the Wellington VA.

ceeding against Wellington VA for payment of a note allegedly secured by a Second Deed of Trust against the debtor's apartment complex.[5] The debtor argued that the signature on the Second Deed of Trust was a forgery and that it did not owe any money to First Bank based on that document.[6]

On June 1, 2005, the debtor filed the instant Complaint against the defendants based on their allegedly fraudulent conduct surrounding the placement of First Bank's Second Deed of Trust on the debtor's apartment complex. On July 22, 2005, the defendants filed a Motion to Dismiss Counts I, II, IV, V, VI, VII, VIII and IX of the Complaint, which Motion they withdrew in open court on September 21, 2005. The defendants eventually answered the Complaint on October 4, 2005.

On July 14, 2005, the instant adversary proceeding, the adversary proceeding filed by First Bank against the debtor and an Objection to Claim of First Bank filed by the debtor were procedurally consolidated by Order of the Court.

While the attorneys for both sides have managed this case and their clients with the utmost professionalism, the parties themselves have been uncooperative with each other. The discovery motions began on October 27, 2005, when the debtor filed its first Motion to Compel against Merel, Clotworthy, WPN and G & M; the next day the defendants filed a Motion to Sever this adversary proceeding from the other litigation listed above and stay the discovery, or in the alternative for the Court to issue a protective order to protect certain information, and an objection to the discovery propounded by the debtor. The debtor objected to the Motion to Sever and after a hearing on November 15, 2005, the Court denied the Motion and ordered the defendants to answer the discovery requests of the debtor.

On December 16, 2005, the debtor filed a Motion for Sanctions against Merel, Clotworthy, WPN and G & M, and after a hearing held on January 3, 2006, the Court declared WPN to be in default for failing to answer discovery and ordered Clotworthy, Merel and G & M to fully and completely answer interrogatories propounded by the debtor and produce all requested documents. The debtor then filed a Motion to Approve Entry of an Order Establishing Certain Facts as to WPN in light of its default. That motion was not decided because prior to a ruling, WPN requested that the Court reconsider its ruling regarding WPN's default. The Court granted the reconsideration motion, but refrained from issuing a second ruling on WPN's default, and instead took the matter under advisement. Given the ruling found in this Memorandum Opinion and Order, the debtor's Motion to establish certain facts as to WPN is moot and a hearing on the issue of sanctions against the defendants will be scheduled pursuant to the Court's order entered February 17, 2006.

On February 7, 2006, the debtor filed a second Motion for Sanctions against Merel and G & M for failing to timely respond to discovery, and then providing unsworn answers to Interrogatories and providing minimally responsive documents to a Re-

---

**5.** While the litigation between the debtor and First Bank was pending, debtor's apartment complex was sold pursuant to an order of this Court.

**6.** FRD, LLC, a subsidiary of First Bank, purchased the First Deed of Trust to protect First Bank's interest as the holder of the allegedly forged Second Deed of Trust. The debtor never disputed its debt to FRD on the First Deed of Trust. In fact, that undisputed debt was paid from the proceeds of the sale of the apartment complex.

quest for Production of Documents more than two weeks after the deadline to respond. That same day the defendants filed a Motion for Summary Judgment or in the Alternative, Partial Summary Judgment, based on several equitable defenses. A week later the defendants filed their own Motion to Compel, asking that Nizan be forced to turn over copies of his tax returns for the years 2000–2004, to which debtor's counsel responded that she could only ask Nizan to turn over his tax records, but that she could not force him to do so as Nizan is not the debtor. The Court agreed with the debtor, but stated that the defendants would have the opportunity to ask Nizan about his tax records when he appeared at the trial. As for the Motion for Summary Judgment, the Court heard arguments on March 1, 2006, and denied such relief as to all counts except those involving legal malpractice and breach of fiduciary duties by Merel and G & M, which the Court took under advisement. The Court advised that the defendants could renew their summary judgment motion at trial.

Prior to trial, the debtor and First Bank miraculously settled their dispute, which resulted in Wellington VA paying First Bank $2,300,000. This settlement meant that the trial would deal only with the Complaint in the instant adversary proceeding.

Finally, the trial was held over five days, March 1, 2, 3, 6, and 8, 2006. After the plaintiff debtor rested its case, the defendants moved for Judgment on Partial Findings pursuant to rule 52(c) of the Federal Rules of Civil Procedure as incorporated into Bankruptcy Rule of Civil Procedure 7052(c). The defendants argued they were entitled to such relief for two reasons: 1) this action is basically an indemnification proceeding and the debtor failed to prove actual or potential liability on First Bank's claim and did not show that the settlement was reasonable, and 2) that the debtor failed to meet its burden of proof on the legal malpractice and breach of fiduciary duty claims for several reasons, including the fact that the debtor did not call an expert witness to opine on Illinois law; it failed to prove an on-going attorney client relationship between the debtor and Merel/G & M; and it did not prove that Merel/G & M were informed that the services were being provided for the benefit of a third party. The debtor responded that the action is not one of indemnification, but rather one of lost equity to the debtor and that no expert was needed as both Merel and G & M failed to meet the minimum standards set forth in the Illinois Code of Professional Responsibility.

The Court overruled the defendants' Motion for Judgment on Partial Findings for two reasons: 1) the Court had not had time to review the depositions of two important witnesses, Gerry Nudo ("Nudo") and Robert Walters ("Walters"), and 2) there was sufficient evidence before the Court regarding the activities of Merel and G & M during the original loan transaction, the 2002 loan modification and the 2004 loan restructuring to overcome the motion. Finally, as to the reasonableness of the settlement between the debtor and First Bank, the Court found that the Order approving the settlement declared it fair and equitable; therefore, that issue was binding under the doctrine of *res judicata* and the defendants were required to proceed with their case. Upon completion of the trial, the parties submitted their Findings of Fact/Conclusions of Law and their replies.

B. *History of Ran Nizan and the Debtor, Wellington VA*

Nizan was born and raised in Israel and moved to the United States when he was

25 years old. (Tr. pp. 77–78). He has lived and worked in Connecticut since 1995, which is also when he began buying and managing income producing real property. (Tr. pp. 77, 83). In 1997, Nizan purchased Ennis Management, a previously existing property management company, and formed a new entity, Ennis Management, L.L.C., at which time Nizan became a full-time property manager. (Tr. pp. 86–87). Nizan was managing two hundred fifty (250) apartment units by the end of 1997, one thousand five hundred (1,500) units by the end of 1998, and almost three thousand (3,000) units by the end of 1999. (Tr. p. 87). Nizan attributes the tremendous growth of the company to the acquisition efforts of Avram Cimmering ("Cimmering"), a person with whom Nizan partnered in 1997 to purchase and manage properties all over the United States. (Tr. pp. 89–90, 712).

Throughout their business relationship, Nizan and Cimmering formed many single purpose entities to purchase the properties. (Tr. p. 90). Nizan testified that Cimmering would locate properties and acquire the hard money loans to purchase them. (Tr. pp. 88–89). These original loans were always short-term and carried high interest rates and fees; the consistent goal was for Cimmering to obtain refinancing with conduit lenders, "Wall Street firms that [ ] sell bond[s to] finance the deal." (Tr. p. 98). Nizan's responsibilities in the partnership included inspecting the properties prior to their purchase and then managing them once the sales were complete. (Tr. p. 90). Nizan testified that he was involved very little in obtaining financing for any of the properties he and Cimmering bought, since he was very busy

performing the day-to-day functions of managing their many units. (Tr. p. 90.).

Wellington VA was formed in 1997 for the sole purpose of acquiring a 152–unit apartment complex in Newport News, Virginia for a purchase price of $2,300,000 (Tr. 117–18), which acquisition was completed on December 31, 1997. (Pl. Ex. 1). Wingate Realty Finance Corporation ("Wingate") funded the $1,996,000 conduit loan (Tr. p. 118–19), which was collateralized by a deed of trust against the apartment complex. (Pl. Ex. 1). Nizan's father and his business partner contributed the remainder of the purchase price. (Tr. p. 100). The Wingate deed of trust is filed in the land records for the City of Newport News. (Pl. Ex. 1).

Eventually, in 1999, Nizan's relationship with Cimmering soured and the partners separated their holdings (Tr. p. 91); each took ownership of approximately one thousand two hundred (1,200) units, or roughly half of the units they owned jointly at the time.[7] (Tr. p. 91). One of the properties Nizan obtained during this separation was Wellington Apartments. As stated above, Nizan is part owner and a managing member of Wellington VA and is authorized to make decisions for the debtor. (Tr. p. 120).

### C. *Connections between Wellington VA and the defendants*

There are a multitude of players in the saga of the Wellington/First Bank loan and it is difficult to sort out the relationships. In an effort to more fully understand what has transpired in this case, the Court lists

---

**7.** Cimmering eventually defaulted on one of the loans for which he and Nizan were personally responsible, but that Cimmering had agreed during their business separation that he would pay. Therefore, a second business separation agreement was signed by Nizan and Cimmering, wherein Nizan bought Cimmering out of the defaulted property. Nizan was able to do so by bringing in another investor.

here each person/entity separately and describes their involvement with the debtor.

*Amnon Cohen*

Nizan met Amnon Cohen ("Cohen") in 1996 through a mutual friend when Nizan was attempting to secure financing for one of his projects. (Tr. pp. 92, 710). Mr. Cohen was working for Harold Baker, a mortgage broker, at the time of their meeting. (Tr. p. 710). Nizan was using Harold Baker's services during this time period.[8] (Tr. pp. 92–93). At some time during 1997 or 1998, Nizan and Cohen formed their own business, Aspen Capital, a real estate and mortgage brokerage. (Tr. pp. 93, 712). Cohen owned 49.5% of the business and MB Holding, a company owned equally by Cimmering and Nizan, owned 50.5%. (Tr. p. 93).

Cimmering and Cohen worked in Aspen Capital's office in New York, locating properties for sale and obtaining the financing for their purchase. (Tr. p. 94). Nizan worked for his property management company in Connecticut. (Tr. p. 94). Nizan testified that he instructed his property management company to provide Cimmering with whatever information he needed to complete the financing of new properties, which information Cimmering was said to have requested daily. (Tr. p. 95).

When Cimmering and Nizan divided their interests in 1999, Cimmering retained his ownership of Aspen Capital and Nizan transferred his interest in the company to Cohen. (Tr. p. 94). Nizan testified that there then came a time that Cohen no longer wanted to work with Cimmering and as a result, Cimmering transferred Nizan's previously owned interest back to Nizan. (Tr. pp. 94–95). It is unclear from the evidence presented at

trial what happened to Cimmering's interest, but Nizan and Cohen continued to operate Aspen Capital. (Tr. p. 94.). Nizan testified that Cohen took over the financing and acquisition aspects of the business and Nizan continued to handle the property management duties. (Tr. p. 95).

Cohen handled all the loan documentation once Cimmering was no longer involved. (Tr. p. 713). Cohen stated that he created Nizan's financial statements, but that the information came directly from Nizan's office. (Tr. p. 714). Cohen testified that he often signed Nizan's name to documents while working for Aspen Capital, but always with Nizan's permission. (Tr. p. 719–20). Cohen further testified that he and Nizan had a very close relationship and that Cohen spent time at Nizan's home and with his family, and that the two talked several times a day by telephone. (Tr. p. 720).

*Steve Byers & the Wexford & WexTrust Entities*

Nizan met Steve Byers ("Byers") in mid–1999 on the same day Nizan finalized his separation from Cimmering. (Tr. pp. 100–01). Cimmering and Cohen had been negotiating for financing with Steve Byers' company, HSA/Wexford BancGroup ("HSA/Wexford"), for the Lee Hall Apartments, a project located in Virginia. (Tr. p. 101). Nizan knew of these negotiations, needed to serve Cimmering with the legal business separation papers, and knew that Cimmering would be at the HSA/Wexford offices in Chicago on a date specific (Tr. p. 101); Nizan traveled to Chicago to deliver the separation papers to Cimmering in person and met Byers at the HAS/Wexford office. (Tr. p. 101).

8. It is unclear from the evidence presented whether Nizan used Baker's services as a result of being introduced to Cohen or vice versa.

The Lee Hall Apartments was the first loan that HSA/Wexford provided funding for on any of Nizan's entities. (Tr. pp. 101–02). HSA/Wexford was a table lender, meaning it would perform the underwriting on the loan and then transfer the package to a conduit lender, who would fund the deal simultaneously with HSA/Wexford. (Tr. pp. 100–01). These types of loans were made in the name of HSA/Wexford, but because of the simultaneous funding would immediately be transferred to the conduit lender. (Tr. p. 101). This arrangement allowed HSA/Wexford to count the loan among the deals that it brokered, without having to actually fund the loan.

In early 2000, Byers wanted to leave HSA/Wexford and start his own company, but he needed capital. (Tr. p. 102). Someone from HAS/Wexford contacted Cohen and as a result, Nizan's father and his father's business partner invested $250,000 in a new company called Wexford BancGroup. (Tr. p. 102). That investment bought them a 15% ownership interest in the new company, which ownership was held by an entity called Whitestone. (Tr. p. 102). Whitestone was owned equally by Nizan's father and his partner (they collectively owned 50%) and Cohen and Nizan (who collectively owned the other 50%). (Tr. p. 103). Nizan testified that Cohen was given ownership in Wexford BancGroup to allow him to obtain an interest in the properties whose loans he brought to the group, which was something Cohen required and had learned from Cimmering. (Tr. p. 103). Cohen felt he deserved the ownership interests because he was bringing in many loans (both Nizan– and non-Nizan-related) and was facilitating all of the loan documentation between Wexford BancGroup and its borrowers.

Nizan states that Wexford BancGroup was headquartered in Chicago and that he had very little to do with the management of that company. (Tr. pp. 104–05). He testified that he did not have signatory authority on any Wexford BancGroup bank accounts and that the only distribution ever made by Wexford BancGroup to Whitestone, of which he was also the manager, was $15,000 in late 2000. (Tr. pp. 104–05). He testified he did receive K1s from Wexford BancGroup, but never received a copy of Wexford BancGroup's full tax return. (Tr. p. 106).

In 2001, Byers and Nizan formed Wexford Trust as an umbrella organization into which they merged all of Byers and a portion of Nizan's properties. (Tr. p. 836). The two men obtained a $3,000,000 line of credit from Cole Taylor Bank, which appears to have been the beginning of the end of their business relationship. (Tr. p. 836–37). This line of credit was to be used as a bridge loan for Wexford Trust's various properties when bills became due, but rents had not yet been received. (Tr. p. 837). According to Byers, Nizan was the only person who had utilized the line of credit and by the fall of 2001, Nizan had drawn $1,600,000 from the line of credit loan. (Tr. p. 837–38). Additionally, Byers testified that around the same time period, the $600,000 that Wexford Trust had deposited in a compensating balance account with Cole Taylor Bank also disappeared. (Tr. p. 838). Byers said that when pressed, Nizan stated he would return the money and attempted to obtain an investor to do so, but was ultimately only able to repay $300,000–$400,000. (Tr. p. 838–39). Byers testified that he repaid the full balance due to Cole Taylor Bank. (Tr. p. 839).

In 2002, Wexford BancGroup ceased operations. (Tr. p. 527). In 2003, WexTrust Capital was formed and is Byers' current operating company, which he owns with

Cohen. (Tr. p. 524). WexTrust Capital owns Wexford Equity Partners, which identifies income producing properties available for purchase. (Tr. p. 526).

Byers developed or bought into other entities as well. In 2000, he formed Wexford Capital Partners, but the company was not capitalized and had no assets. (Tr. pp. 522–23). Byers testified that the purpose of the company was to sign contracts for the purchase of property and then assign those contracts to other entities. (Tr. p. 523). However, Wexford Capital Partners never purchased any assets. (Tr. p. 524). Additionally, Byers bought into Aspen Capital after Nizan and his partners bought into Wexford BancGroup (*See* Tr. p. 620), and he is heavily involved in several real estate ventures with Clotworthy and Merel (Tr. p. 309).

One of the most important entities in which Byers is a partner, as it relates to these proceedings, is WPN. He and Nizan became equal partners in WPN in 2000, when each purportedly contributed $750,000 in capital contributions to fund the company. (Tr. p. 574). This money, as is explained below, was actually derived from equity in Wellington Apartments and used to invest in the Poydras building.

*Wexford/Wextrust Entities, First Bank and Ran Nizan*

Wexford BancGroup was one of First Bank's top five customers from 2000–2002, while it was in operation, earning First Bank millions of dollars in loan fees and interest. (Tr. p. 529).

Byers testified that First Bank liked to control its lending environment and did so by keeping their staff small, with two people, Mike Winter and Charlene Madura, basically "running the show." (Tr. p. 530).

He also pointed out that First Bank was very "tight-lipped" about their loan approval process, but did acknowledge that loans were generally approved by the nod of either Mike Winter or the president of the bank, Mr. Hershenhorn. (Tr. pp. 530–31). Later, Byers stated that he thought First Bank was very efficient because they would close their loans in short periods of time based on the approval of Mike Winters and without a lot of paperwork. (Tr. p. 540).

Nizan testified that in 1999 and 2000, Wexford BancGroup was the primary source of financing of both hard money and conduit loans for Nizan related entities. (Tr. p. 106). Cohen was the primary person interacting with Wexford BancGroup on behalf of Nizan and his entities. (Tr. p. 107). Wexford BancGroup obtained most of those loans through First Bank; in fact, eight loans for Nizan-related entities [9] over the period of 1999–2000 were financed with hard money loans through First Bank, only two of which were successfully refinanced into long-term loans. (Tr. pp. 107–10).

Nizan testified that he had almost no contact with First Bank regarding any of the loans, but rather Cohen, Byers, and Rondella Hunt, Byers' secretary, handled all communications with First Bank. (Tr. p. 110). Nizan noted that First Bank was difficult to deal with because they did not return phone calls. (Tr. p. 111). Nizan stated that any requests for documents that First Bank made of him had a specific chain of command; First Bank would ask Wexford BancGroup for the documents, which would in turn ask Aspen Capital, which would contact Nizan's office to obtain the documents. (Tr. p. 111). Byers testified that Cohen "was typically the

9. Those loans were on the following properties: Linwood, Wichita Apartments, Bridge-

way, Wintergreen, Uptowne, 158, and Arbor/Oxford.

point person, the broker, and the processor for Ran Nizan." (Tr. p. 538). However, Byers also testified that he thought Nizan dealt directly with First Bank on the Arbor/Oxford loan. (Tr. p. 536).

For every loan that Wexford obtained through a Nizan-related entity, Wexford was supposed to be paid a broker's fee from three sources, First Bank, the lender and Aspen Capital, but that there were times when Wexford would take ownership interest in properties in lieu of such fees. (Tr. p. 534).

*Charles H. Clotworthy, III*

Charles H. Clotworthy, III ("Clotworthy") began working for Byers in 1997 as an employee of Wexford BancGroup and currently works for WexTrust Capital. (Tr. p. 309). Clotworthy, Byers and Rick Merel ("Merel") are also business partners, who currently own or have owned several pieces of real estate together. (Tr. p. 309–10). As explained below, Clotworthy and Merel purchased Nizan's interest in WPN from Nizan's personal bankruptcy estate and consequently became partners with Byers in that company, sharing in its distributions. (Tr. p. 462). The three men are also equal partners in WP New Orleans (Tr. pp. 322–23), a company which improperly appropriated WPN's capital contribution to the purchase of the Poydras building. This, too, is explained below.

*Rick Merel/Garfield & Merel*

Merel is an attorney and licensed real estate broker in Chicago, Illinois; he has been practicing law for almost thirty-one years. (Tr. pp. 346–47). He is a named partner in the firm of Garfield and Merel ("G & M"), which consists of three partners and two associate attorneys. (Tr. pp.

346–47). Steve Alderman ("Alderman") and Mr. Garfield are the other two partners. (Tr. p. 347). From the evidence presented at trial, Garfield & Merel ("G & M") first became involved with Byers and Nizan in 1997, when G & M performed the necessary legal work to create Wexford BancGroup, the first entity in which Byers and Nizan partnered. (Tr. p. 519). Merel and/or G & M went on to represent many of Byers' and Nizan's interests and did so particularly during the 2001 loan modification and the 2002 loan restructuring with First Bank. *See* discussion *Infra*, Sections D and E.

Additionally, Merel and Byers were partners in several real estate ventures, specifically Wichita, Bridgeway and Wintergreen Apartments. (Tr. p. 152). G & M represented Wexford BancGroup in the Wichita and Lansdale closings (Tr. pp. 153, 359–60) and First Bank in Bridgeway closing. (Tr. p. 153). During such closings, Nizan testified that it was not unusual for Byers to demand a percentage of ownership in the properties on which he performed work, and usually made such demands just days before the scheduled closing so that declining his demand was not truly an option. For example, in the Lansdale acquisition, Nizan felt he had to give Byers a percentage of ownership in the apartments when it was demanded just days before closing, because the money had already been advanced by the bank and a down payment had been made on the loan. (Tr. p. 153–155, Pl. Ex. 142 [10]).

G & M also represented First Bank in several real estate closings. (Tr. pp. 489–93).

*Gerry Nudo/Marc New Orleans*

Gerald Nudo ("Nudo") is one of the principals in Marc Realty, which is an

---

10. While exhibit 142 is a letter from the lender, Wexford Bancgroup, Nizan reiterated that Byers was closely affiliated with the lender as he did the underwriting for loans.

Illinois limited liability company that primarily manages real property, mostly in the Chicago area. (Nudo dep. pp. 5–6). Nudo testified that he became involved with the parties when Merel called him to tell him of the Poydras building, an investment opportunity in New Orleans. (Nudo dep. p. 8–9). After analyzing the situation, Marc Realty decided to invest $3,800,000 to facilitate the acquisition of the Poydras building. (Nudo dep. pp. 9–10). Nudo testified that he understood that an additional capital contribution was going to come from Lobel and Weber, who were jointly contributing $1,000,000, and that the remainder of the money was going to be provided through a bank loan. (Nudo dep. pp. 10–11). He then testified that the business plan he had hoped would work was not feasible because the rents were lower than anticipated. (Nudo dep. p. 23). Later, in mid–2003 Marc Realty wanted to sell its interest in the Poydras building and began marketing its ownership by word of mouth. (Nudo dep. p. 25). Nudo stated that Marc Realty had several contracts on the building, but finally sold to Stewart Capital. (Nudo dep. p. 27, 31). Lobel and Weber decided to sell their interest along with Nudo's group. (Nudo dep. p. 32). Nudo testified that at the time his group was attempting to sell their ownership in the building, Nizan tried to tell him of a dispute he was having with his partners, Merel, Byers and Clotworthy over the $1,500,000 investment, but Nudo testified that he told Nizan that he did not want to get involved with that issue. (Nudo dep. p. 33–34).

Nudo also testified as to Merel's role throughout the 2004 transaction. He stated that Merel was not only a partner in the business venture; he also served as the attorney for the entire transaction. (Nudo dep. pp 9, 38–39, 40, 41). Nudo testified that he obtained separate counsel when he sold his interest in Poydras, because he did not want Merel to handle that matter. (*Id.* at 80).

Now that the important players have been identified and their connections to the debtor and the underlying transactions have been explained, let us turn to the transactions that give rise to the Complaint.

### D. *The 2000 Wellington Loan and Purchase of the Poydras Building*

Clotworthy, who lived in New Orleans at the time, learned from SRSA Commercial Realty that the Poydras building, also known as the Freeport–McMoran building, in New Orleans was for sale. (Tr. p. 311). The building is a 23–story, Class A office building and corporate headquarters for Freeport–McMoran Copper & Gold, Inc., a publicly traded company, which is a large producer of copper and gold. Freeport McMoran, or a company affiliated with it, has always been the largest tenant in the Freeport McMoran Building and the term and provisions of its lease have always been the primary factor considered by lenders and investors when valuing the building. (Tr. 336).

Clotworthy "evaluated the numbers" on the proposed sale and then identified the investment opportunity to Byers in the fall of 1999. (Tr. p. 312, p. 820). Byers then began looking for investors to purchase the building. Byers negotiated and executed a contract, dated January 7, 2000, for the acquisition by Wexford Capital of the Poydras building at a total purchase price of $37,500,000. (Ex. 43). However, it was Wexford BancGroup that funded the $250,000 deposit required by that contract. (Tr. p. 547) The original group of people involved with the purchase of the Poydras building was Byers, Clotworthy, Merel and Nizan ("the Original Group"). (Tr. p. 820).

Nizan testified that he first learned of the availability of the Poydras building from Cohen. (Tr. p. 141). Nizan presented the investment opportunity to Jordan Slone, whom Nizan thought might be interested in the property.[11] Slone was interested and at Slone's request Nizan set up a meeting in Chicago with the Original Group. (Tr. p. 141). Nizan testified that he never intended to personally invest money in the Poydras building, but thought that if he brought in an investor he would get an interest in the building (Tr. p. 142). Slone was considering investing approximately $7,500,000. (Tr. p. 821). Slone then visited the property in New Orleans, a meeting which Nizan was to attend, but he missed his flight. (Tr. p. 143). Slone met with Clotworthy, who gave him a tour of the building. (Tr. pp. 143, 312–13). Slone decided not to invest and Nizan testified that he did not look for another investor. (Tr. p. 144).

Nudo's group, Marc Realty stepped in when Slone declined to invest. (Tr. p. 315, Nudo depo. pp. 5–6). Marc Realty agreed to invest $3,800,000, but only if those putting in actual cash received a 12% preferred return.[12] (Tr. p. 315, Nudo depo. pp. 5–6, 13–15). However, with Marc Realty's investment and a loan obtained from Paine Webber in the amount of $29,200,000, there was a $3,500,000 shortfall of cash that the Original Group had to cover in order to close the deal. (Tr. p. 822, Pl. Ex. 49). Clotworthy found two additional investors, Earl Webber and Ken

Lobell, who added $1,000,000 to the deal (Tr. p. 314). Clotworthy received an ownership interest in the property for finding investors, but was not to receive any distributions until the cash investors received their priority return. (Tr. p. 314, 317). Additionally, Byers negotiated an approximately $1,000,000 reduction in the purchase price, which meant that the Original Group only had to raise an additional $1,500,000 to invest. (Tr. p. 827).

Byers testified that Nizan told him he had enough cash to cover the $1,500,000 shortfall. (Tr. p. 823). Byers also testified that he gave up his claim to a $900,000 brokerage fee to facilitate the deal. He testified that he and Nizan agreed that if Byers gave up his fee and Nizan contributed the $1,500,000, they would form an equally owned entity, WPN, LLC ("WPN"), to hold their ownership interest in the Poydras building. (Tr. p. 822). Byers testified that he felt justified in taking a 50% interest, even though he did not put in any cash, because he was foregoing his fee, he had brokered the deal with a large reduction in the purchase price, and he had obtained very difficult financing.[13] (Tr. p. 826–27). Later Byers said that Nizan told him he did not have the cash, but did have equity in several properties and was willing to pledge one of them in order to borrow the necessary $1,500,000. (Tr. p. 824). Byers testified that he does not remember the exact conversation he had with Nizan, but Nizan

11. Nizan had purchased the Lansdale Apartments from Slone, so he knew something of Slone's real estate dealings. Coincidentally, that loan closed in April 2000, the same time that the Wellington loan closed.

12. Byers testified that he chose Nudo's firm over Slone's because Nudo was local to Chicago and the Original Group would receive a higher ownership percentage in the project if they went with his firm. (Tr. p. 822). The

evidence does not bear out that a choice was to be had; Slone declined to invest in Poydras.

13. Byers was able to secure a nonrecourse loan, which was difficult because of the risk of rollover and the location of the building; many companies were moving out of New Orleans and lenders were difficult to find. (Tr. p. 828–29).

wanted him to negotiate with First Bank on Nizan's behalf regarding which property to pledge for the loan. (Tr. p. 824).

Byers said that First Bank wanted a second mortgage on Wellington Apartments in exchange for the $1,500,000, (Tr. p. 825), which information Byers related to Nizan. (Tr. pp. 722, 829). Byers testified he warned Nizan that obtaining a second mortgage on Wellington was a default on the first mortgage, but Nizan thought it was worth the risk, because by the time the first mortgage holder might find out about the second mortgage, Nizan intended to have the second mortgage paid off. (Tr. p. 830). Byers testified that Nizan anticipated paying off the second mortgage either through income derived from his properties or by bringing in new investors. (Tr. p. 868).

Byers further testified that Nizan's portion of the distribution from the Poydras building was deposited into a Wexford Trust account and then sent to First Bank to pay the Wellington second mortgage payment, all at Nizan's direction. (Tr. p. 833).

Nizan denies any knowledge of the second mortgage on Wellington Apartments at the time it was placed on the property. He testified that he did not sign the second mortgage, did not give anyone permission to sign it, and that his signature is a forgery. (Tr. pp. 125, 190–91). Nizan testified that he was in route to, or was actually in Israel when the 2000 Wellington/First Bank loan closed. (Tr. p. 125). Nizan denied preparing the financial information found in Pl. Ex. 4 or the consents found in Pl. Ex. 6 and stated he never forwarded them to First Bank. (Tr. p. 123). He further testified that he never authorized the wiring of $1,500,000 from First Bank to Stewart Title. (Tr. p. 125).

Nizan explained that he had no reason to know of the second deed of trust because the debtor never received any bills regarding the loan, (Tr. p. 126) even though he had several other loans with First Bank at the time and received regular correspondence on those loans, as well as bills, 1099s, and requests for updates on financial and insurance information. (Tr. p. 126–27). He received nothing regarding Wellington. (Tr. p. 127).

Nizan also testified that he did not know that group of investors had purchased the Poydras building or that he knew at the time that he had acquired ownership in the Poydras building through WPN. (Tr. p. 144). Nizan testified that he never received any financial information from Poydras, including K1s or other tax documents. (Tr. pp. 146–47). As for Poydras appearing on his financial statements, Nizan testified that Cohen always prepared his financial statements and while he reviewed them for accuracy at the beginning of his and Cohen's relationship, after 1998 he did not. (Tr. pp. 146–47).

Nizan admitted signing his 2001 financial statement (Def.Ex.N), which says "Lakeland" at the top, and stated that his fax number appears on the statement, but does not know to whom it was faxed. Nizan denied that his signature is affixed to the April 26, 2002 financial statement (Def.Ex.O) [14], which also says "Lakeland" at the top and bears his name, but stated that it did have his fax number at the top. (Tr. p. 147–48). Again, he does not know to whom it was faxed. (Tr. p. 148). However, Nizan later testified that he faxed either his 2001 or 2002 financial statement to First Bank but does not remember

14. Def. Ex. O was admitted for the limited purpose of showing that it was faxed from Nizan's company, PMG.

which one. (Tr. p. 290). Nizan also stated that he could not remember whether he received a request for his financial statement dated July 3, 2001 from First Bank (Tr. p. 289, Def.Ex.Y) or whether he received a fax from First Bank, dated January 31, 2002, informing him that the Wellington Apartments loan was in default. (Tr. p. 290–91, Def.Ex.Z). Nizan testified he would not have looked at any correspondence from First Bank at that time as he had instructed his staff to send any correspondence regarding the properties to Byers, Cohen or Ramsey, the man Byers had hired to take over property management once Nizan and Byers' relationship ended. (Tr. p. 293–94).

As for the Wellington tax bills that Annamarie Faubel, the Controller in Nizan's Connecticut office, faxed to First Bank on June 4, 2001, along with a letter stating that they had been requested, Nizan stated Ms. Faubel faxed those documents without his knowledge or authorization. (Tr. p. 291–92).

Nizan admits that his accountant pointed out inaccuracies to him in his 2001 financial statement, such as a net income of $150,000 per month, and Nizan testified that he told her to inform First Bank of the inaccuracies, but he never followed up to ensure that it was actually notified. (Tr. p. 148). When asked by defense counsel why he would instruct his accountant to notify First Bank, when he testified that he did not know to whom the 2001 financial statement was sent, Nizan stated that he assumed it had been sent to First Bank as it was found on the fax machine in his office. (Tr. p. 182). Nizan admitted that the spreadsheet attached to the 2001 financial statement showed he owned a 16.6%

interest in Poydras and 100% of Wellington Apartments, both of which were incorrect. (Tr. pp. 188, 190).

Nizan denied any knowledge of a letter dated January 9, 2001, that was sent to Cohen from Lawyers Title Insurance Company ("LTIC") stating that LTIC owed Wellington Apartments $1,479.24 from the 2000 loan closing and that Wellington Apartments owed LTIC $3,291.00 from the second loan closing (Tr. p. 193); the letter requested a setoff and required a signature to do so. (Def.Ex.P). Cohen testified that he showed the letter to Nizan, who told Cohen to sign it and that Nizan would pay the money that was owed. (Tr. p. 754). Cohen further testified that Nizan was not surprised to see references to a second mortgage on Wellington Apartments. (Tr. p. 754–55). Cohen then signed the letter as Nizan and returned it to LTIC. (Tr. p. 755).

Nizan maintained that he first learned of the second mortgage on the Wellington Apartments in mid– to late–2002 through a call or letter from First Bank. (Tr. pp. 122, 193–94, 209–10). He testified that he immediately called Cohen, who told Nizan that Byers "f——d" him [Nizan]. (Tr. p. 195). Nizan then contacted his attorney in Virginia, Mike Hamar, about the Wellington Apartments debts. (Tr. p. 196). Nizan testified that he followed the advice of his attorney [15] and filed a Quit Claim Deed transferring the Wellington Apartment project from Wellington CT to Norfolk Homes, but transferred it back once he realized that such a transfer was a mistake. (Tr. p. 197). Nizan stated that once he discovered that a second mortgage had been placed on Wellington Apartments, he attempted to obtain copies of all the docu-

**15.** It is unclear from the testimony which attorney gave Nizan this advice because after mentioning Mike Hamar's name, Nizan then says that he later consulted with another at-

torney, Jim Curran, who ultimately filed Wellington CT's Chapter 11 bankruptcy in Connecticut.

ments from First Bank, but they refused to turn them over unless Nizan would sign over all the leases and rent rolls from Oxford apartments. (Tr. p. 196). Nizan said that he was only able to first obtain a copy of the Second Deed of Trust after foreclosure proceedings were started against Wellington Apartments by First Bank. (Tr. p. 197). Nizan testified that he was not sent notice of the foreclosure, but only found out about it when the property was listed for sale and his attorney, Jim Curran, contacted the attorney listed in the sale ad, who sent Curran a copy of the Second Deed of Trust. (Tr. p. 197). In fact, Nizan further testified that it was not until the current litigation with First Bank and the defendants that Nizan was able to obtain all the documents associated with the 2000 Wellington loan. (Tr. p. 157–58). Nizan testified that Curran advised him to put Wellington CT in bankruptcy to stop the foreclosure sale. (Tr. p. 198). At trial, Nizan testified that he knew that the legal owner of Wellington Apartments was Wellington VA (Tr. pp. 199, 200), but thought the trustee who was appointed in Wellington CT's bankruptcy case would address the allegedly fraudulent second mortgage on the apartments (Tr. pp. 199–203). Nizan admitted that as the manager of Wellington VA he did nothing to rectify the situation, *e.g.* the proper titling of the Wellington Apartments. (Tr. p. 203).

When the 2000 Wellington/First Bank loan was made, Wellington Apartments was worth approximately $2,300,000 to $2,600,000. (Tr. p. 501).

*Ownership of Poydras*

On April 7, 2000, the same day as the closing of the 2000 Wellington /First Bank loan, the closing on the purchase of the Poydras building took place. (Pl. Exs. 50, 51). At that time three companies held ownership interests in Poydras, LLC: 1) Marc New Orleans, LLC, a 79.5% owner with a capital contribution of $6,300,000, 2) Poydras Tower Management, a 1% owner with a $100 capital contribution, and 3) WP New Orleans, LLC, a 1% owner interest with a $100 capital contribution. (Pl. Ex. 84). In reality, neither Poydras Tower Management nor WP New Orleans contributed any cash. (Tr. p. 319).

Marc New Orleans was made up of the following members:

| Member | Capital Contribution | % Interest |
|---|---|---|
| Gerald Nudo | $ 50,000 | .5% |
| Lawrence Weiner | $ 50,000 | .5% |
| Freeport–Marc, L.L.C. | $3,700,000 | 59.3% |
| WPN, L.L.C. | $1,500,000 | 23.9% |
| Earl E. Weber, Jr. | $ 500,000 | 7.9% |
| Kenneth H. Lobell | $ 500,000 | 7.9% |

(Pl. Exs. 89, 113). WPN's $1,500,000 contribution was derived from the proceeds of the 2000 Wellington loan. (Tr. pp. 418, 822). All the members of Marc New Orleans, who contributed cash, were to receive a 12% priority return on their investment. (Nudo dep. p. 14).

There was never a fully executed Operating Agreement for Marc New Orleans (Tr. p. 401–403, Pl. Ex. 13), but there is a copy that is dated March 24, 2000 that bears Nizan's signature on behalf of WP New Orleans (33rd page of Pl. Ex. 52), although it was never asserted by any party that Nizan owned or was ever a manager in WP New Orleans. Nizan testified that the signature on the Operating Agreement is his, but he could not explain how it came to be on the document! (Tr. pp. 295–97).

Likewise, there was no fully executed copy of the Poydras Operating Agreement. Equally as odd as Nizan's signature on the Marc New Orleans agreement is his signature on the Poydras Operating Agreement. (Pl. Ex. 76). Nudo testified that he recognized his own signature on the document,

but stated that he would not recognize Nizan's signature, and they did not sign the document at the same time; further, he did not understand why Nizan's signature would be on the Poydras Operating Agreement. (Nudo dep. pp. 34–35).

The owners of Poydras received distributions beginning in 2000. (Pl. Ex. 57).[16] WPN received distributions of $162,042.00 from April 2000 to September 2001 (*Id.*), $531,528.30 from October 2001 to February 2004 (Pl. Ex. 151, p. 6), and $22,950.00 from August 2004 to August 2005 (Pl. Ex. 59).[17] WP New Orleans received distributions of $99,450.00 from August 2004 to August 2005. (*Id.*).

### E. *Extensions of the Wellington Loan*

There were two extensions of the Wellington loan, the first in 2001 and the second in 2002 (Def. Ex. J and L, respectively). Nizan admitted signing the loan modification in 2001 on the Wellington loan, but explained that there were several loans that had to be extended before the end of the quarter or else First Bank would have to report them to the FDIC as being in default. (Tr. p. 128). Nizan testified that he flew to Chicago on June 29, the last day of the quarter, at Byers insistence, to sign numerous documents in triplicate (Tr. pp. 128, 131); however the notary for Nizan's signature lists a date of July 10, 2001 (Def.Ex.H), a date on which Nizan says he was not in Illinois.[18] (Tr. pp. 128–29). Nizan testified that no notary was present when he signed the documents. (Tr. p. 131). In fact, he testified that he flew to Chicago the morning of June 29, 2001, rented a car (corroborated by his review of his credit card statement, Pl. Ex. 140), drove to First Bank, met with a male representative, signed and initialed all the documents, drove back to the airport and flew home. (Tr. p. 129). He testified that he was not at First Bank's offices for more than thirty minutes. (Tr. p. 129). Nizan stated he did not read the documents before he signed them, but that he thought he was signing loan modifications on Arbor Village, Oxford, Linwood and Uptown. (Tr. p. 129). Nizan acknowledged that above his signature on Def. Ex. J appears the name Wellington Apartments, LLC, as well as on the face of the documents, but maintained that he did not see those references when signing. (Tr. pp. 171–72). Nizan also admitted to signing and initialing the Amended and Restated Secured Demand Note for Wellington Apartments, LLC, (Def.Ex.K), but denies having read it before he signed it. (Tr. p. 174).

Relative to the second amendment, a meeting was held at First Bank's offices in Chicago in December 2001 to discuss loans that were in default. (Tr. pp. 133–34, 840). Byers, Nizan and Cohen met with Bob Walter, Rick Schuller and possibly Gretchen Harms of First Bank. (Tr. pp. 134, 840–41). Nizan testified that his purpose in attending the meeting was to attempt to

**16.** Counsel for the defendants objected to this exhibit prior to trial based on a lack of foundation and hearsay, but at trial Byers testified as to its accuracy and the objection was not renewed. While it was not formally admitted into evidence, the debtor overcame the objection and the Court will rely on the exhibit.

**17.** Counsel for the defendants also objected to this exhibit prior to trial based on a lack of foundation and hearsay, but at trial Gray testified as to its accuracy and the objection was not renewed. While it was not formally admitted into evidence, the debtor overcame the objection and the Court will rely on the exhibit.

**18.** It is interesting to note that a separate document regarding a different set of apartments that Nizan testified he signed in Chicago on June 29, 2001 were notarized that it was signed on September 10, 2001. (Tr. p. 131–32, Pl. Ex. 31).

get First Bank to lower the interest rates on the Bridgeway, Wintergreen, Uptown, Linwood, Arbor Village and Oxford loans, which were set at 12% at the time, so that the loans could be brought current. (Tr. p. 134). These were the loans for which Nizan testified that he was making the monthly payments. (Tr. pp. 140–41). Nizan stated that Wellington was not discussed, but that some of Byers' loans were discussed. (Tr. p. 136). Nizan testified that First Bank was willing to drop the interest rate to 10%, but Nizan told Byers that the rate was still too high to turn the properties around. (Tr. pp. 135–36). Nizan said that he and Byers agreed that Nizan would turn over the management of the specified apartments to Byers, which Nizan did in January 2002; Byers hired Chuck Ramsey to handle those duties after that. (Tr. p. 136). Significantly, Nizan did not turn over the management of Wellington. (Tr. pp. 138–39). Nizan testified that he did not have a great deal of interaction in the relationship between Byers and First Bank after that turnover of management duties. (Tr. p. 137). He testified that, however, that he continued to receive correspondence from First Bank, which he would turn over to Cohen, who was acting as a liaison between Byers and Nizan. (Tr. pp. 139–40). He also testified that he was required to sign some additional documents in 2002 because he was still a guarantor on the loans with First Bank. (Tr. p. 139).

Byers' account of the December 2001 meeting with First Bank differs from Nizan's. He testified that their entire portfolio of loans was discussed at this meeting, but the major emphasis was on the loans that were "the problem loans." (Tr. p. 841). Wellington was not a problem

loan at the time and Byers testified that it was only mentioned, and not discussed in detail. (Tr. p. 841). He testified that Nizan showed no signs of surprise to hear the Wellington loan mentioned and never said anything about a forgery. (Tr. p. 842). As a result of the meeting, Byers testified that Nizan was going to bring all the loans current and sent a check to First Bank at the end of December for that purpose, but the check bounced. (Tr. p. 843). Byers stated that First Bank then refused to work with Nizan any further and put extensive pressure on Byers to manage the properties, and later to personally guarantee several of Nizan's loans. (Tr. pp. 843–44, 847).

Byers testified that it became increasingly difficult to get Nizan to sign any necessary documents and, therefore he asked Nizan for a general Power of Attorney authorizing Byers to sign for him, which Nizan gave to Byers. (Tr. p. 848, Def.Ex.M). Byers testified that this Power of Attorney gave him the right to sign the Second Modification Agreement between First Bank and Wellington CT in March 2002.[19] Nizan testified that he did give Byers authority to sign for him, but only for the companies listed on Exhibit M, Arbor Village, Bridgeway, Wintergreen, Linwood, and Uptown Square Apartments, as Nizan was going to be out of the country when documents would need to be signed to complete the loan. Nizan testified that he never intended to give Byers the authority to sign anything for Wellington Apartments. (Tr. pp. 165–66, 175, 178, Def.Ex.L).

F. *The 2004 Restructuring of the Ownership of the Poydras Building*

As stated previously, the original owners of the Poydras building were Marc New

---

**19.** The Court notes that Byers signed his own name and not Nizan's name on the Second Modification Agreement.

Orleans, WP New Orleans and Poydras Tower Management. The owners agreed to a tiered distribution of proceeds from the building rents, with parties who made a cash contribution to the Poydras building acquisition in 2000 receiving a 12% preferred return before any other distributions were made. (Nudo dep. p. 14). After a few years of disappointing rents, Nudo wanted to sell his ownership interest, but Merel, Byers and Clotworthy did not want to give up their interest, and they were no longer insistent on the priority return. (Tr. p. 283).

In 2004, Stewart Capital purchased a 76% interest in the Poydras building from Marc New Orleans and Poydras Tower Management, which necessarily had to include a majority of WPN's interest in Marc New Orleans, LLC. (Tr. p. 257). Marion Gray ("Gray"), Stewart Capital's Chief Financial Officer, stated that John Kushner, a New Orleans real estate broker, informed Gray of the opportunity to purchase the 76% interest; Gray understood that 100% of the ownership or the entire building was never for sale. (Tr. pp. 257, 266). Gray stated that he understood from Mark Goode, Marc Realty's broker, that Byers, Merel and Clotworthy owned the other 24% interest in Poydras, (Tr. p. 259) and that Merel later confirmed that fact to Gray. (Tr. p. 260, Pl. Ex. 93). Gray testified that he understood that the prior ownership of Poydras had a two-tiered distribution system. (Tr. p. 282). Merel testified that when Stewart Capital bought out Marc New Orleans and Poydras Tower Management, Stewart Capital's investors insisted that the two-tiered preferential distribution system be eliminated. (Tr. p. 938). But when asked by debtor's counsel if Stewart Capital re-

quired that that distribution system be done away with before it would move forward with the purchase, Gray testified that it did not make such a requirement. (Tr. p. 264). Gray stated that Stewart Capital's only requirement was that it came away from the closing table with a free and clear 76% controlling interest in Poydras. (Tr. p. 264). He stated that it was the minority partners who did not like the priority distribution system and so Stewart Capital and the minority partners agreed to a straight pro rata distribution. (Tr. p. 283).[20]

Merel's own testimony seems to belie the statement that Stewart Capital was forcing the phase out of the tiered distribution, when he stated that he wanted to remain in the Poydras deal after Marc New Orleans sold out and felt he deserved a larger share of the remaining ownership percentage because he brought Stewart Capital in on the deal. (Tr. pp. 934–36).

In addition, when debtor's counsel pressed Nudo on why he insisted on a signed Joinder from WPN regarding the dismantling of the tiered distribution (Pl. Ex. 89), Nudo never answered the questions, but instead insisted that he had no reason to believe that Byers and Merel did not have the authority to dilute WPN, which was the end result. (Nudo dep. p. 54). Nudo said both Merel and Byers had always represented to Nudo that they were in charge of WPN. (Nudo dep. p. 54). However, Nudo also testified that Nizan had told him that he was in a dispute with Byers and Merel regarding WPN's interest in Poydras, but Nudo said that he did not want to discuss it with Nizan. (Nudo dep. p. 33).

**20.** On cross-examination Gray seemed to negate his prior testimony that it was the minority partners' idea to do away with the tiered distribution system, but his statements made after his initial response supports his previous testimony that the majority owners simply agreed to a straight forward distribution. *See* Tr. p. 286.

Once the preferred distribution was done away with and WPN's 23.9% ownership interest in Marc New Orleans was distributed pro rata among the other members, which all happened prior to the sale to Stewart Capital at the request of Merel, the ownership of WPN and WP New Orleans appear to be solely in the names of Merel, Byers and Clotworthy. (Tr. p. 283).

As a part of the 2004 transaction, Gray testified that Stewart Capital and the 24% minority partners were going to share management fees (Tr. p. 268–69, Pl. Exs. 98, 99, 100a) and that the minority partners knew that Stewart Capital had successfully extended Freeport–McMoran's lease until 2011. (Tr. p. 271). Gray stated that the fees distributed to WPN from August 2, 2004, to August 1, 2005, totaled $21,600.78 and those paid to WP New Orleans totaled $93,603.51. (Tr. p. 275–76, Pl. Ex. 59)[21]. Gray also testified that the distributions to the partners during that same time period totaled $22,950 to WPN and $99,450 to WP New Orleans. (Tr. pp. 275–76). Finally, Gray stated that due to Hurricane Katrina no distributions have been made since August 2005. (Tr. p. 276).

Gray testified that he knew Merel was an attorney and was negotiating on behalf of and representing the minority partners throughout the 2004 transaction. (Tr. p. 272). He stated that Merel was drafting documents and corresponding with Stewart Capital's attorney relative to its purchase of a 76% interest in the Poydras building. (Tr. p. 273).

After Stewart Capital purchased the 76% interest, Merel asked Stewart Capital to change the ownership percentages of the companies comprising the minority 24% to reflect Merel as the sole owner of WP New Orleans with 8% ownership, and Byers and Clotworthy as the owners of WPN with a total of 16% ownership. (Tr. p. 276, Pl. Ex. 93). Later, the minority partners told Stewart Capital that they wanted to change their ownership percentages again and Stewart Capital obtained approval from the lender to do so. (Tr. p. 277). On March 24 2004, Gray sent an email to the primary Poydras lender, stating that the minority partners wanted to change their ownership percentages as follows: WP New Orleans 19.5% [Merel] and WPN 4.5% [Byers and Clotworthy], which was done. (Tr. p. 278, Pl. Exs. 95, 96). Interestingly, Merel was not able to explain why Paine Webber, the lender on the Poydras building, had an organizational chart that showed Nizan as the sole owner of both WP New Orleans and WPN. (Pl. Ex. 126).

As for the capital contributions for each member, Gray testified that he basically "backed into" the numbers. (Tr. p. 281). First, the majority owners purchased a 76% ownership interest in Poydras for $5,000,000, so if 76% equals $5,000,000, then by simple arithmetic WP New Orleans' 19.5% interest would equate to a capital contribution of approximately $1,300,000 and WPN's 4.5% interest would amount to a capital contribution of $200,-000–$300,000. (Tr. p. 281).[22]

---

**21.** Counsel for the defendants objected to this exhibit prior to trial based on a lack of foundation and hearsay, but at trial Byers testified as to its accuracy and no objection was made. While it was not formally admitted into evidence, the debtor overcame the objection and the Court will rely on the exhibit.

**22.** Gray noted that as a result of wind driven rain and flood damage to the Poydras building subsequent to Hurricane Katrina, the building sustained approximately $4,000,000 in damage. He stated that the investors have made four or five capital calls to remediate the damages and the costs associated therewith, but that the minority partners only re-

As a final note here, Gray testified that Stewart Capital marketed the Poydras building for sale after it purchased it; obtaining some offers, the highest being $39,500,000 in mid–2005. Stewart Capital did not sell its majority interest in the Poydras Building because it thought the price was too low. (Tr. p. 274). He testified that the debt owing on the building at the time the offer was made was approximately $28,000,000. (Tr. p. 274).

*Ownership and Control of WPN*

The ownership and control of WPN is integral to the case at hand. The ultimate issue in this case is who rightfully owns WPN's interest in the Poydras building and to whom should distributions, based on WPN's ownership interest, have been paid. It is equally important to understand who was making decisions for WPN, especially during the 2004 transaction.

From its inception, the legal organization of WPN has been a problem. Merel testified that when WPN was created he had his secretary sign the Articles of Organization, although he was unsure if Nizan was available at the time to sign them. (Tr. pp. 387–89, Pl. Ex. 45). Merel testified that this was not unusual; he had his secretary often sign Articles of Organization for clients, when those documents need to be filed with the State of Illinois, but it was never done without consent of the client. (Tr. pp. 387–88). However, when pressed by debtor's counsel, Merel could not remember whether Nizan gave his secretary permission to sign on his behalf and admitted that it was probable that he, Merel, had simply instructed her to sign. (Tr. p. 388).

As stated previously, the money WPN invested in the Poydras building was obtained from the 2000 Wellington/First Bank loan and the money was written in WPN's accounting records as having been contributed in equal parts by Byers and Nizan. Byers admitted full knowledge of how the money was obtained (Tr. p. 541), while Nizan stated he was ignorant to the entire transaction. (Tr. pp. 121–22). Cohen testified that just as the Wellington /First Bank loan was about to close, Nizan left for Israel (Tr. p. 725) and instructed Cohen to sign the loan documents for him. (Tr. p. 726). Cohen said Nizan was adamant that prior to signing any loan documents on Wellington, Cohen must obtain for Nizan a signed Operating Agreement for WPN. (Tr. pp. 728–29). Cohen testified that a copy of the WPN Operating Agreement was prepared at the Wexford office with Byers signature on it and that Cohen went there and signed Nizan's name to it. (Tr. p. 731). Cohen immediately recanted and testified that he could not remember whether he simply picked up the Operating Agreement and delivered it to Nizan to sign because it already had Byers's signature on it. (Tr. p. 731). However, Cohen did remember he delivered a copy of the Operating Agreement signed by Byers to Nizan. (Tr. p. 732). There were two Operating Agreements for WPN admitted into evidence, an original with two signatures, Byers and Nizan, that gives each 50% ownership (Def.Ex.AF), and an amended and restated unsigned copy, which gives Byers, Nizan, and WP New Orleans each a one-third interest.

sponded to the first capital call, contributing approximately $70,000. Gray testified that the majority partner has contributed in the minority partners' stead, and pursuant to the Operating Agreement, that automatically dilutes the minority partners' stock and provides a larger ownership interest to the ma-

jority partner. He stated that the partners have had discussions regarding restructuring the debt and other possible financial solutions and that the majority partner has been able to recoup approximately $500,000 in insurance proceeds. (Tr. pp. 283–85).

(Pl. Ex. 115). Cohen testified he did not sign the WPN Operating Agreement (Def.Ex.AF). (Tr. p. 731). Likewise, Nizan denied he ever signed an Operating Agreement for WPN. (Tr. p. 168–69).

During the 2004 restructuring, it was Byers who consented on WPN's behalf to waive WPN's 12% priority return on income generated by the Poydras building. (Pl. Exs. 86, 88, 89). Byers testified that he did not benefit from the 2004 transaction. (Tr. p. 867). He also testified that he did not care what happened to the Wellington loan because it was Nizan's responsibility and Byers had already been saddled with so many of Nizan's other debts that he was hardly able to cope; therefore, he was not concerned with whether the Wellington loan was paid. (Tr. p. 891).

### G. Communications with Nizan's Chapter 7 Trustee

Nizan testified that he was forced into personal bankruptcy in 2002 because of problems with the Lee Hall loan. (Tr. p. 158). Nizan listed his interest in two companies on his schedules, 20 % of ETR, LLC and 50% of NI, USA, both of which he listed with a value of $0.00. (Def.Ex.AG). Nizan did not list any interest in WPN, LLC, which was brought to the Connecticut bankruptcy court's attention by Nizan's Chapter 7 trustee, Barbara Katz, in an Amended Motion For Order Authorizing the Sale of Property of the Estate Free and Clear of Liens, Claims, Encumbrances and Interests. (Def.Ex.AM, p. 3). Katz also stated in her Motion that she believed that Nizan might own other interests in other companies that he did not disclose, including an interest in Poydras building. (Def.Ex.AM, p. 3).

Katz requested financial information regarding these companies from Merel, who was listed as the registered agent for the companies. (Tr. pp. 469–72). Merel acknowledged that he did not provide the trustee with a complete financial picture of Poydras, by not revealing a side contract WPN had with Stewart Capital for a portion of the management fees paid on the building, and by opining that the value of the property was diminishing, due in large part to the fact that Freeport–McMoran's lease was "burning off." (Tr. pp. 271, 337, 341, 470, 472, 474, Ex. 98–100b). Merel also provided other limited and misleading information (Tr. 470, 473, Pl. Ex. 135, 136) and did not correct misleading information that he knew was transmitted to the trustee's attorney. (Tr. 459–61). Merel stated that he did not give the trustee all the information he had regarding the companies because he did not feel that it was his responsibility to provide her with the documentation necessary to ascertain the value of WPN's interest in Poydras. (Tr. p. 474).

Additionally, Merel and Clotworthy used a strawman, Leonard Casey, a friend of Clotworthy's, to purchase Nizan's interest in WPN from his bankruptcy estate. (Tr. p. 947). Merel explained that they thought it best to use a strawman so no one would find out that it was an insider who was attempting to purchase Nizan's interest. (Tr. p. 462). Merel paid the fee of the strawman's attorney, Gerry Metzger, so that he would submit a bid to Katz to purchase Nizan's interest in WPN from his bankruptcy estate for $35,000. (Tr. pp. 456–58). Merel testified that the money for the fee was eventually repaid to him out of distributions from the Poydras building. (Tr. p. 483).

Finally, Nizan testified that he disclosed during his personal bankruptcy that the signature on the Wellington/First Bank loan was a forgery, but admitted that as the Manager of the debtor he did nothing

to pursue that action at that time. (Tr. p. 201). Nizan clarified that he was unable to obtain the documents necessary to understand what had happened until the commencement of the instant case. (Tr. p. 201).

## H. *Merel's and G & M's Representation of Wellington*

Nizan testified that G & M represented him numerous times. First, Nizan personally hired G & M at the end of 1999 or the beginning of 2000 in the wake of the Cimmering/Nizan split and Merel "helped [Nizan] structure [a] forbearance agreement with Ocwen Bank" on the Nizan guaranteed loans for Alderwood, Midtown, Stonehouse, Lakeland and Arbor Village Apartments, at least one of which was in default. (Tr. pp. 149–50). G & M was paid for their services. (Tr. p. 149). Nizan also testified that Alderman then represented all the borrowers in the 2002 First Bank loan restructuring. (Tr. p. 151). In fact, Nizan testified that he believed that G & M represented all the entities in which he and Byers had an interest in connection with the renewal of those entities' loans with First Bank. (Tr. p. 151). Nizan said Byers told him that G & M prepared and reviewed all the documents for the loan renewals with First Bank prior to Nizan or Byers signing them. (Tr. pp. 151–52).

Merel testified that he knew that Byers and Nizan were attempting to obtain a loan from First Bank in order to invest in the Poydras building. (Tr. p. 349). He denied being involved with the negotiation of the 2000 Wellington loan. (Tr. p. 349). He admitted he did tell First Bank's attorney, Rob Glantz, where to wire the money at the end of the transaction, because he "was representing the buyer in connection with the Poydras acquisition." (Tr. p. 350). Merel admitted that he knew that the proceeds from the Wellington closing

were being used in the purchase of the Poydras building, so the Wellington loan had to close either before or simultaneously with the Poydras acquisition. (Tr. pp. 351–52).

Merel and/or his office did prepare four Unanimous Written Consents in anticipation of the 2000 Wellington loan, one each for Wellington Apartments, LLC, Fairborn Apartments, LLC, Harvard Apartments, LLC, and Wichita Apartments; these executed consents were faxed from Aspen Capital to Merel's office on April 6, 2000, and minutes later Merel faxed them to Rob Glantz, the attorney representing First Bank. (Tr. pp. 352–55, Pl. Exs. 5, 6, Def. Ex. X). Merel could not recall who asked his office to prepare the consents (Tr. p. 356), but each authorized the company to borrow $1,615,000 from First Bank and gave Nizan signatory authority to obtain said loan. (Pl. Ex. 6). Merel testified that he had no personal knowledge of any of the four apartment complexes, but admitted when questioned about Wichita Apartments, that he owned those apartments with Byers. (Tr. pp. 355, 153).

Additionally, Nizan testified that G & M represented the lender on other loans; specifically G & M represented Wexford BancGroup on the closing of Wichita Apartments and First Bank on the closing of Bridgeway Apartments. (Tr. p. 153).

As a final note, Nizan testified that the debtor has spent $250,000 on legal fees, most of which were incurred as a result of the First Bank litigation. (Tr. p. 162).

## II. ARGUMENTS

The basic premise of the debtor's arguments is that the defendants forged Nizan's signature without his knowledge on the Second Deed of Trust on Wellington Apartments in order to obtain $1,500,000, which the defendants needed and used to complete the purchase of the Poydras

building in New Orleans. The debtor argues that once the money was siphoned away from Wellington, the defendants then restructured the ownership of the Poydras building in such a manner that any benefit to the debtor was eliminated, while leaving the debtor saddled with the debt. The debtor was left with the liability without any benefit resulting from the investment created from its equity.

The defendants argue that this is simply a business deal gone terribly wrong. They say that Nizan desperately wanted to be included in the ownership of Poydras and willingly pledged Wellington Apartments to raise the $1,500,000 needed to buy into the deal. They argue that Nizan offered First Bank a mortgage on other properties, but that First Bank refused those properties and requested a mortgage on Wellington, to which Nizan readily agreed, with the intention of obtaining new financing and paying off the First Bank second mortgage. The defendants adamantly deny forging any signatures, but state instead that Nizan had given a power of attorney to Cohen or Byers so that documents could be signed in his absence. They state that the debtor did receive the benefit of the distributions from the Poydras building, as those distributions were used for two years to pay the debt service on the Wellington loan. They argue that Nizan became angry when those payments on the debt ceased and that was when he concocted this story of fraud and forgery.

### III. CONCLUSIONS OF LAW

The authority of the debtor herein to pursue each Count in this Complaint is predicated on the fact that the debtor is acting as a debtor in possession. A debtor in possession assumes the special rights and duties that are usually reserved for the trustee, as directed in § 1107 of the Bankruptcy Code ("Code"), which states that "a debtor in possession shall have all the rights ... and powers, and shall perform all the functions and duties ... of a trustee serving in a case under this chapter." 11 U.S.C. § 1107 (2005).

### Count I—Business Conspiracy

Count I of the Complaint alleges that "Byers, Merel, Clotworthy, WPN and WP New Orleans ('the Defendants') combined for the purpose of willfully injuring the Debtor in its business." Complaint ¶ 86. Under the Virginia Conspiracy Act there is criminal liability for "any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of ... willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." Va.Code Ann. § 18.2–499 (2004), *see Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 144 F.Supp.2d 558, 601 (W.D.Va.2001), *aff'd*, 307 F.3d 277 (4th Cir. 2002), *cert. denied*, 538 U.S. 998, 123 S.Ct. 1900, 155 L.Ed.2d 824 (2003). Section 18.2–500 allows a civil action to be filed to recover treble damages and to obtain an injunction against the conspirators. Va. Code Ann. § 18.2–500(a) & (b).

In such a civil action the plaintiff must prove by clear and convincing evidence that the defendants acted in concert with legal malice and that the plaintiff suffered a causally-related injury. *Virginia Vermiculite, Ltd.*, 144 F. Supp 2d at 601, *see also Simmons v. Miller*, 261 Va. 561, 578, 544 S.E.2d 666 (2001), *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 526 (4th Cir.1997). Legal malice can be found when the defendant acted intentionally, willfully and knowingly. *Galaxy Computer Services, Inc. v. Baker*, 325 B.R. 544, 555 (E.D.Va.2005), *Simmons*, 261 at 578, 544 S.E.2d 666, *Advanced Marine Enterprises, Inc. v. PRC Inc.*, 256 Va. 106,

117, 501 S.E.2d 148 (1998). Additionally, injury to the plaintiff's trade or business need not be the "conspirator's primary and overriding purpose," *Simmons,* 261 Va. at 578, 544 S.E.2d 666, but it must be proven to be *one* of the purposes of the conspiracy. *Id.*

The debtor alleges that the 2004 transaction evidences a business conspiracy against the debtor. The debtor argues that in contemplating and executing the 2004 restructuring of ownership in the Poydras building, Merel, Clotworthy, and Byers conspired to dilute WPN's interest in the investment, eliminate WPN's 12% priority return it was receiving as a member of WP New Orleans, which had been used to pay the Wellington/First Bank loan, and prevent WPN from selling its interest in the Poydras building and using those proceeds for the debtor's benefit. The debtor argues that after effectively cutting the debtor off from the income producing asset that had been acquired using the debtor's equity, the defendants then left the debtor to pay the First Bank debt on its own.

In order to prove a conspiracy under the statute, at least two people had to have combined intentionally for the nefarious purpose of harming the victim's business. Unfortunately for the debtor, it does not make it over this initial hurdle. The evidence at trial showed that Merel did not know of the debtor's existence until the commencement of this litigation.[23]

Likewise, no evidence was introduced at all regarding Clotworthy's knowledge of the existence of the debtor. He was not asked the first question about Wellington VA to prove whether he knew it existed, much less conspired to harm its business. According to the definition of "person" found in § 18.2–493, any person, firm or corporation can participate in a conspiracy. Va. Code Ann. § 18.2–493. However, WP New Orleans is owned by Byers, Merel and Clotworthy and WPN at the time was owned equally by Byers and Nizan. Nizan is not a defendant and when Merel and Clotworthy are removed from the equation, as the evidence necessitates, there can be no conspiracy because the only remaining defendant is Byers.[24] He can not conspire alone. Consequently, this cause of action must fail and judgment is entered for the defendants.[25]

### Count II—Fraudulent Transfer

The debtor alleges in Count II that by consummating the 2004 Transaction, Byers, Merel, Clotworthy, WPN and WP New Orleans intentionally hindered, delayed or defrauded the debtor from collecting monies rightfully belonging to it, rendered the debtor insolvent and deprived Wellington VA of its right to utilize the priority return on the income of the Poydras building, or the proceeds from its sale, to satisfy the First Bank loan. Complaint ¶¶ 92–99. The debtor is not only asking that the Court void the transfer as a fraudulent conveyance, but also for an *in*

23. While debtor's counsel did present evidence that Mike Lucash, who worked at Wexford BancGroup at the time, learned of the existence of Wellington VA and passed that information along to First Bank (Tr. pp. 372–73 Pl. Ex. 41) on May 9, 2002, there was no evidence that Merel or anyone at his firm learned that information at that time.

24. The other two defendants listed in this Count are WPN and WP New Orleans, both of

which are owned by Byers, Merel and Clotworthy and the above analysis effectively eliminates them from being able to conspire with Byers.

25. This is not to say that this cause of action might not perhaps lie for Nizan, personally, or Wellington, CT, although the Court does not decide those issues here.

*personam* judgment against Byers, Merel, Clotworthy, WPN and WP New Orleans in the amount of $1,500,000 with pre-judgment interest from March 31, 2004.

■ Virginia fraudulent conveyance law states:

> [e]very gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, ... given with the intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives, or assigns, be void.

Va.Code Ann. § 55–80. At its core, a "fraudulent conveyance ... is the diminution of the debtor's estate to the detriment of the creditor's right of realization." *Buchanan v. Buchanan*, 266 Va. 207, 211–12, 585 S.E.2d 533 (2003) (citing I Gerard Glenn, Fraudulent Conveyances and Preferences § 319, at 556 (rev. ed.1940)), *see also The Estate Construction Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 218 (4th Cir.1994) ("Historically, this section of the Code has provided protection to creditors fraudulently deprived of their interest in property.") (citing *Christian v. Gray Endowment*, 33 F.2d 759, 760 (4th Cir.1929)).[26] The debtor in possession has the authority to seek relief as a lien creditor pursuant to § 544(b)(1) of the Code which states:

> [T]he trustee may avoid any transfer of an interest of the debtor in property of any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

The debtor argues that the defendants transferred property of the debtor (i.e. the interest in the Poydras building and the 12% priority return thereon that was payable to WPN), thereby diminishing the estate through the 2004 restructuring of the ownership interests in the Poydras building. They were only able to accomplish the offending restructuring by the manipulation of the operating agreements of WPN and Poydras, LLC.[27] Specifically, the debtor argues the original operating agreement for Poydras required that all investors contributing cash to the acquisition would receive a 12% priority return on their investment. The debtor states that in order to avoid paying the debtor that return the defendants created new operating agreements, by either forging Nizan's name or improperly using a signature authorization[28] given by Nizan to Byers for the specific purpose of signing documents relating to Arbor Village Apartments, Bridgeway Apartments, Wintergreen Apartments, Linwood Apartments, and Uptown Square Apartments. (Def.Ex.M). In these fraudulent new Operating Agreements, the defendants caused WPN to waive the 12% priority return, allowed WPN to be removed as a member of Marc New Orleans, and accepted for WPN a

---

26. It is interesting to note, however, that Virginia courts have found "other persons" who have been entitled to recover under this statute. *See Crowder v. Crowder*, 125 Va. 80, 99 S.E. 746 (1919) (allowing spouses who have been deserted protection under this statute), *Bruce v. Dean*, 149 Va. 39, 140 S.E. 277 (1927) (allowing a person who brings a tort suit against the debtor to pursue fraudulently transferred assets).

27. This company was comprised of other member companies, specifically, WP New Orleans, Poydras Tower Management and Marc New Orleans.

28. This authorization was often referred to by the parties as a power of attorney, but the Court does not decide whether it met the legal requirements of such a document.

4.5% ownership interest in the Poydras building. The debtor argues that this was done so that Marc New Orleans and Poydras Tower Management could sell their 76% ownership of the Poydras building without being required to pay WPN any of the proceeds from the sale, which it would have been entitled to under the cash investors' priority return clause in the original operating agreement. Those proceeds could have been used by WPN to payoff the Wellington/First Bank loan. During the 2004 transaction, the debtor's capital contribution was also transferred from WPN to WP New Orleans and its owners, Byers, Clotworthy and Merel without consideration. The debtor states that those actions deprived the debtor of what rightfully belongs to it and therefore the transfer should be void.

The defendants argue against this Count, as well as Counts II, IV and V, that if the 2000 Wellington/First Bank loan was *bona fide*, meaning that Nizan entered into the second mortgage knowingly and willfully, then the debtor would not have any equitable interest in the distribution of income from or proceeds of the sale of the Poydras building; all the equity Counts of the Complaint, they argue, would fail as a matter of law. What the defendants seem to forget in this argument, just as they did during the trial, is that the debtor and Nizan are two separate entities under the Code and Nizan's knowledge can not be imputed to the debtor. 11 U.S.C § 544(a), *see e.g. In re Greenbelt Coop. Inc.*, 124 B.R. 465, 471 (Bankr.D.Md.1991) (holding that the debtor in possession could utilize the strong-arm powers of the trustee to avoid an unperfected security interest even though the debtor knew of the interest prior to bankruptcy because the two are distinct entities, and the debtor in posses-

sion's responsibility is to "preserve the estate's assets for the benefit of the creditors.") (*Id.*). Therefore, Nizan's personal knowledge of events prior to the bankruptcy is immaterial.

Looking again to the statute, it appears that there was a transfer of real or personal property done with the intent to delay, hinder or defraud a creditor. The Court finds that a transfer occurred when WPN's ownership interest in the Poydras building, which was originally held as a 23.9% interest in Marc New Orleans with a 12% priority return for cash investment, was exchanged for a 4.5% direct interest in the Poydras building, thereby eliminating the priority return. This leaves but one question outstanding. Was the debtor *lawfully* entitled to receive the ownership interest and the priority return of the distribution from the Poydras building? This Court finds that it was.

■ Whether the Court believes Nizan or the defendants as to the events that gave rise to the 2000 Wellington/First Bank loan makes no difference in this instance. Regardless of who signed documents, the fact remains that the money for the investment in Poydras was derived from the equity in the debtor. Therefore, any ownership interest purchased in the Poydras building using that money should have been purchased in the name of the debtor. That, of course, did not happen in this case, but rather ownership was taken in the name of WPN and the money from the loan was originally "booked" on the records of WPN as equal $750,000 contributions from Nizan and Byers.[29] Assuming, *arguendo*, that the defendants' version of events is correct, that Nizan, as a managing member of Wellington VA and authorized to act on its behalf, borrowed against the debtor's equity in its sole asset

---

**29.** Now credibility becomes an issue because defendants or potential defendants are indi-

cated by whose account of events you believe.

to invest in the Poydras building; then in order to fulfill his fiduciary duties to the other owners of the debtor (his wife, his father and his father's business partner) the ownership interest in the Poydras building would have had to have been taken in the debtor's name. Otherwise, given the evidence at trial, Nizan would be guilty of conversion of the debtor's assets for his own benefit. Assuming that Nizan is telling the truth and that his name was forged on the 2000 Wellington/First Bank loan documents, then Byers and Cohen and possibly others would be liable for stealing $1,615,000 from the debtor. In either event, it is obvious that the debtor has a legal right to whatever ownership interest WPN obtained in the Poydras building, because all of WPN's capital contribution was derived from the borrowing against the equity in the debtor and both theories deprive the debtor of that interest and the priority return that accompanied it.

■■ The Court finds that the debtor has a legal claim to the ownership interest in the Poydras building. Consequently, the Court finds that the debtor met its burden of proof and the transfer is void as fraudulent pursuant to Virginia Code § 55–80. Generally, when dealing with real property, voiding the transfer and restoring title to the previous owner is appropriate. *See Price v. Hawkins,* 247 Va. 32, 37, 439 S.E.2d 382 (1994) (holding that because the case did not involve realty where title could be restored, monetary damages were appropriate). This case, however, presents a unique set of facts and given the jurisdictional issues[30] and the complexity of attempting to undo a sale of property through Nizan's bankruptcy and a sale to Stewart Capital, which appears to the Court to be an innocent participant in

the 2004 transaction, voiding the transfer is not a feasible option. This Court is reluctant to say "that the General Assembly intended to provide a § 55–80 cause of action without a remedy." *Id.* Given the many facets to this case, it appears that a monetary judgment against those who transferred the debtor's interests away from it would be the most appropriate course of action. The Court, therefore, awards the debtor an in personam judgment against Byers, Merel, Clotworthy, WPN and WP New Orleans, jointly and severally, in the amount of $1,615,000.

Alternatively, the application of the statute to the facts at hand does not preclude an award based on the common law. *APAC Virginia, Inc. v. Jenkins Landscaping & Excavating, Inc. (In re Jenkins Landscaping & Excavating),* 93 B.R. 84, 87 (1988) ("The statute and the common law doctrine provide alternative, not mutually exclusive, forms of relief.... The fraudulent conveyance statute and the common-law doctrine are complementary rather than contradictory."). Bankruptcy courts are courts of equity, *Young v. United States,* 535 U.S. 43, 50, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002), striving for fairness and justice under the law. Operating under the principles of equity, it appears to this Court that a monetary judgment is the only feasible solution to the issue at hand; therefore, an *in personam* judgment in the amount of $1,615,000 is granted against Byers, Merel, Clotworthy, WPN and WP New Orleans, jointly and severally.

### Count III—Transfer Rendering the Debtor Insolvent While Creating a Debt

Similar to Count II, here the debtor alleges that Byers, Merel, Clotworthy,

---

30. By avoiding the transfer the Court would be tampering with the Poydras LA, LLC partnership; the Court does not have the other members of the partnership before it and in fact Poydras LA, LLC's attorney has been present at each hearing and reserved his client's right to object to any remedy that may adversely affect it.

WPN and WP New Orleans benefited from the transfer of the 2000 Wellington/First Bank loan proceeds, while the transfer of said proceeds left the debtor insolvent. Complaint ¶¶ 100–105. The debtor is seeking an *in personam* judgment against said defendants pursuant to Virginia Code § 55–81 which states "[e]very gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law, . . ., by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made. . . ." Va.Code Ann. § 55–81. If the debtor can prove that 1) it received no consideration deemed valuable in law, 2) it incurred a debt at the time of the transfer and 3) it was insolvent or became insolvent at the time of the transfer, then it is entitled to relief under this Count.

■ Before answering the first question, it must be determined what the phrase "not upon consideration deemed valuable in law" means. This phrase has not been construed by the Virginia Supreme Court, but has been interpreted by the Fourth Circuit to mean that something of value must be gained. *C–T of Virginia v. Euroshoe Associates*, 762 F.Supp. 675 (W.D.Va.1991), aff'd, 953 F.2d 637 (4th Cir. 1992) (table decision) [hereinafter *C–T 1*]. That court explicitly found that the consideration does not have to be reasonably equivalent to what is being given up. *C–T of Virginia v. Euroshoe Associates*, No, 91–1578, 1992 WL 12307, at *1–3, *1–2, 1992 U.S.App. Lexis 1029, at *1–6, *4 (4th Cir.Jan.29, 1992) (table decision reported at 953 F.2d 637) [hereinafter *C–T 2*]. Consideration that has been deemed valuable in the law has included the pre-payment of mortgage payments in exchange for the release of secured debt against property, *Shaia v. Meyer, In re Meyer*, 244 F.3d 352 (4th Cir.2001), antecedent indebtedness in exchange for the conveyance of land, *Inspiration Coal, Inc. v. Mullins*, 690 F.Supp. 1502 (W.D.Va.1988), and money in exchange for stock and control of a company, *C–T 1*, 762 F.Supp. 675. The district court in the *C–T 1* case found that as long as something is gained, "that is enough [compensation] to prevent avoidance of the transaction" under Va.Code § 55–81. *Id. at* 678.

■ The evidence adduced at trial clearly demonstrated that the debtor received nothing of value for the transfer of its $1,615,000. The only thing the debtor received for transferring this sum was the correlating debt to First Bank in the form of a lien on its only asset. The Court notes that while it is not an element of this cause of action, the defendants benefited greatly from the transfer. The defendants raised a novel argument at the post-judgment hearing to alter or amend the judgment averring that the debtor did receive something for its money, a promise by the defendants to pay the Wellington/FB loan on the debtor's behalf. This argument has no basis in fact, whatsoever, even if only the defendants' evidence is considered. At trial, Byers testified that he did not care what happened to the Wellington/FB loan as it was not his responsibility and that he paid Nizan's 50% of the Poydras profits to First Bank on the Wellington loan only because Nizan instructed him to do so. To argue now that the defendants made a promise to the debtor in an attempt to avoid liability under this Count of the Complaint creates even more doubt for the Court about the trustworthiness and credibility of the defendants. As an aside, if the defendants had promised to pay the loan, then they breached that obligation by refusing to make any payments beyond mid–2002; however, the Court finds that

no such promise was given as consideration for the loan.

The second element of the voluntary transfer action is the most easy to establish. The debt, in the form of a lien on the debtor's property, attached at the time of the transfer, therefore the debt was incurred at that time and satisfies that element.

▉ Finally, the Court finds that the 2000 loan rendered the debtor insolvent as of April 6, 2000, the date of the loan. The debtor produced unrefuted expert testimony at trial that the debtor's only asset, the apartment complex, was worth between $2,300,000 and $2,600,000 on April 6, 2000, (Tr. pp. 501, 504). However, the debtor owed approximately $2,485,300 before the imposition of First Bank's second mortgage of $1,615,000. Nizan testified that in April, 2000, the debtor owed approximately $1,960,000 to its first mortgage lender and $522,000 to Nizan Inbar Project Management, Ltd. (Tr. pp. 155–57). The Court takes judicial note of its own records, finding that Kelly Karpets, Inc. obtained a mechanic's lien against the debtor's property between 1998 and 1999 for approximately $3,300,[31] bringing Wellington VA's known total debts in April 2000, to $2,485,300. Obviously, the addition of the First Bank loan of $1,615,000 to its existing debt rendered the debtor insolvent.

The defendants argue that there were two transfers that occurred during the 2000 Wellington/First Bank loan, the transfer of the $1,615,000 in proceeds from the loan and then the transfer of Wellington Apartments, in trust, to secure the loan. The defendants argue that it is this second transfer that rendered the debtor insolvent, not the first; accordingly relief can not be granted under this Code section. While this argument might be true in the most technical sense, it is not rational or reasonable. The defendants are attempting to separate the two events as if either would happen independently, which they would not. A security interest would not be granted to a creditor without receiving some equal benefit, and it is very unlikely that a bank would loan such a large sum of money without obtaining some collateral to insure against the risk of default. These two events are co-dependant and, theoretically, happened simultaneously. The Court rejects the defendants' argument and finds that in the context of this case, the two transactions constitute one transfer. Accordingly, the debtor has met its burden of proof under Virginia Code § 55–81 and the transfer is void.

▉ The debtor claims that, just as above in Count II, it is without a remedy for the voluntary transfer of the debtor's property and asks that the Court grant an *in personam* judgment against Byers, Merel, WPN and WP New Orleans. The Court will grant such relief for the same reasons as set forth in the discussion of Count II, but only against Byers and WPN, as these are the only defendants who actually took the debtor's money and would have been required to provide some

---

**31.** This information is taken from two Proofs of Claim filed in the debtor's bankruptcy case. Kelly Karpets, Inc. filed its own Proof of Claim in the amount of $3,486.79, filed August 13, 2004. Additionally, the mechanic's lien is listed as an exclusion from coverage on the title insurance policy attached to Lawyers Title Insurance Company's Proof of Claim filed in the debtor's bankruptcy case on June 10, 2004. *See* Title Insurance Policy, Schedule B, Para. 16. The title insurance policy lists the liens recordation date as February 26, 1999 and the amount of the lien as $3,304.99. The Court used the round figure of $3,300 as that was the last figure given for the debt prior to the 2000 Wellington/FB loan closing date of April 6, 2000.

consideration in return. The Court therefore grants an *in personam* judgment against Byers and WPN, jointly and severally, in the amount of $1,615,000.[32]

### Count IV—Post–Petition Transfers

■ Count IV of the Complaint alleges that Byers, Merel, Clotworthy WPN and WP New Orleans knowingly transferred property, in which the debtor had an equitable interest, post-petition without approval of the Court to the detriment of the debtor. Complaint ¶¶ 108–112. Such transfer should be avoided and the defendants held liable pursuant to Bankruptcy Code §§ 549 & 550, respectively. The defendants maintain that because Nizan knew about the 2000 Wellington/First Bank loan, that there was no forgery and therefore the debtor has no equitable interest to recover.

Section 549(a) of the Code provides that unless such transfer is authorized by the Court the "trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case. . . ." 11 U.S.C. § 549(a). The debtor's case was filed on January 5, 2004, and the 2004 transaction that is complained of occurred over a period of time, with discussions beginning in late 2003, before the debtor filed its bankruptcy petition. The actual transfers did not occur, however, until after the date of the petition. The authorization was given by Byers on behalf of WPN on February 10, 2004,[33] after the date of the petition, to dissolve the priority return structure, remove WPN from the Marc New Orleans group and give WPN a direct, reduced interest in Poydras. This allowed Marc New Orleans to sell its interest in the Poydras building to Stewart Capital on March 31, 2004, after the debtor's petition date. The defendants were solely responsible for these transactions and the Court finds that they were conducted for the defendants' sole benefit. These are post-petition transfers, but of whose property? The Court ruled above that the debtor had a lawful right to ownership of WPN's interest in the Poydras building, which would include the distributions from that building. As discussed infra, the debtor also has an equitable interest in the same. Therefore, this was a transfer of the debtor's property.

The defendants again assume their fall back position by arguing that only fraud perpetrated upon an innocent victim entitles that victim to an equitable interest in the transferred property, *i.e.* the loan proceeds. *See Helm v. Lynchburg Trust & Savings Bank,* 106 Va. 603, 56 S.E. 598 (1907). Additionally, they argue that the debtor is precluded from claiming an equitable interest in the Poydras building or any distributions flowing from it because Nizan's failure to act when he learned of the second mortgage in mid–2002 and because he did not disclose his ownership interest in WPN to his personal bankruptcy trustee. The Court reminds the defendants not to conflate Nizan and the debtor; they are two separate entities as discussed above and Nizan's actions, inactions and knowledge are not attributable to the debtor, much less the debtor in possession.

The Court finds that the debtor has met its burden of proof pursuant to §§ 549 and

---

**32.** The Court notes that this and any subsequent judgment in favor of the debtor is not in addition to the amount awarded in Count II, but rather are just alternate bases for granting the award.

**33.** This appears to be the first date that Byers signature, albeit by stamp, was affixed to the Joinder that allowed WPN's priority return to be eliminated. That same joinder document was faxed on February 16, 2004, from G & M to Marc Realty, but Byers actually signed that document.

550 of the Code and is entitled to a judgment against Byers, Merel, Clotworthy, WPN and WP New Orleans, jointly and severally, in the amount of $1,615,000.

### Count V—Violation of the Automatic Stay

■ Count V of the Complaint alleges a violation of the automatic stay by the defendants through their post-petition transfer of an equitable interest in property of the debtor without relief from the stay or approval of the Court, thereby exercising control over and taking possession of estate property. Complaint ¶¶ 113 –118.

The automatic stay goes into effect immediately upon the filing of the bankruptcy petition. 11 U.S.C. § 362(a), *see Citizens Bank v. Strumpf,* 516 U.S. 16, 21, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), *Intl. Heritage, Inc. v. Gilbert (In re Intl. Heritage, Inc.),* 239 B.R. 306, 310 (Bankr. E.D.N.C.1999). Section 362(a)(3) of the Code prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Given the Court's ruling above that the defendants engaged in a post-petition transfer of the debtor's equitable interest in the proceeds of the Poydras building, the only unanswered question is whether the defendants obtained relief from the automatic stay or court approval before the transfer.

The Court takes judicial notice of its own docket and notes that no Motion for Relief from Stay or Motion to Approve the Transfer, or anything akin to either, was ever filed by the defendants or granted by this Court. However, we can find no evidence in the record that any of the defendants knew of the bankruptcy filed by the debtor, Wellington VA. The testimony and the exhibits presented at the trial indicate, at best, that one or more of the defendants may have been aware of Wellington CT's bankruptcy filing, and certainly they were aware of Nizan's bankruptcy pending in Connecticut. There is no indication that Byers, Merel or Clotworthy knew that the actual owner of the Wellington Apartments in Newport News, Virginia, was Wellington VA, and therefore, they cannot be held to the knowledge of its Chapter 11 proceedings in the Bankruptcy Court. At least Merel knew of the Wellington CT bankruptcy proceedings, which he ignored in transferring the interest of the debtor in WPN post-petition. However, he claims not to have known about Wellington VA until this Adversary Proceeding was served on him, which the debtor did not rebut at the trial.

Therefore, the defendants cannot be held to the standard of knowing, and cannot be deemed with the requirement of knowing, that the stay in favor of the debtor existed. Without the nexus between their knowledge and their improper actions in dealing with the debtor's property, they cannot be saddled with the burden of knowingly violating the automatic stay imposed in favor of the debtor. This action would more properly lie in favor of Wellington CT had it owned the Wellington Apartments. Thus, the Court rules in favor of Byers, Merel, Clotworthy, WPN and WP New Orleans in connection with Count V of the Complaint.

### Count VI—Unjust Enrichment

Count VI alleges that Byers, Merel, Clotworthy,[34] WPN and WP New Orleans

---

34. The Court allowed the debtor to amend its pleading to include the name of defendant Charles H. Clotworthy, III in the prayer for relief in this Count. He was included in the allegation in the Count, but was omitted from the prayer.

are being unjustly enriched to the detriment of the debtor, as they were all aware that the First Bank loan proceeds were being applied to the acquisition of the Poydras building; they used some of the distributions from that asset to pay the debt service to First Bank; and then the defendants deliberately structured the 2004 transaction so as to deprive the debtor of its share of the distributions from the Poydras building and appropriated the ownership interest and further distributions to themselves. Complaint ¶¶ 119–124. The debtor seeks an award of damages in the amount of $1,500,000 against the Byers, Merel, Clotworthy, WPN and WP New Orleans.

■ "To establish a prima facie case of unjust enrichment, the movant must demonstrate '(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value.'" *Halart, LLC v. Independent Auto Warehouse, Inc. (In re Twin B Auto Parts, Inc.),* 271 B.R. 71, 84 (Bankr.E.D.Va.2001) (quoting *Nossen v. Hoy,* 750 F.Supp. 740, 744–45 (E.D.Va.1990)); *see also Provident Life & Accident Insurance Co. v. Waller,* 906 F.2d 985, 993 (4th Cir.), *cert. denied,* 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990).

■ In the instant case, the evidence at trial showed that the $1,615,000 proceeds from the Wellington/First Bank loan were used, with the defendant's admitted knowledge, to acquire the Poydras building. The loan proceeds, in fact, were indispensable to the Poydras deal, for without them that purchase would not have closed. It is important to note that Byers, Merel, Clotworthy and WP New Orleans [35] invested no actual cash in the acquisition of the Poydras building, but each acquired an ownership interest at closing, Byers through WPN and WP New Orleans and Merel and Clotworthy through WP New Orleans. Because WPN's entire interest in the building was purchased using the equity in the debtor's sole asset, ownership of WPN's interest should have been taken in the debtor's name, rather than Byers' and Nizan's; therefore any credits or distributions from the Poydras building paid to WPN and/or its members, constitutes unjust enrichment to them to the detriment of the debtor.

Additionally, during the 2004 restructuring, Byers, acting on WPN's behalf without Nizan's knowledge, relinquished WPN's right to a 12% priority return on the distributions from and the proceeds of the sale of the Poydras building, which was included in the original operating agreement for Poydras, LLC.[36] This relinquishment allowed Marc New Orleans to isolate and remove WPN as one of its members and give WPN a direct 4.5% in the Poydras building, which transfer was necessary if Marc New Orleans and Poydras Tower Management (PTM) were to be able to sell their combined 76% ownership interest of the Poydras building. The remaining 24% of the building was owned by WPN and WP New Orleans, which effectively consisted of Byers, Merel and Clot-

---

**35.** The Court has not included WPN in this list because the money from the Wellington/First Bank loan was funneled into WPN, booked as equal contributions of $750,000 by Nizan and Byers, and then invested by WPN in the purchase of the Poydras building.

**36.** This was the company formed by the other companies purchasing the Poydras building in 2000.

worthy [37] and these owners did not want to sell their interests in the Poydras building. They engineered the 2004 ownership restructuring so that Marc New Orleans could sell its interest and they could remain owners, thereby eliminating any priority return on the money contributed by the debtor and reallocating the debtor's capital contribution, such that it appeared on paper that WPN had only contributed a little under $300,000 and WP New Orleans had contributed over $1,200,000. Prior to the 2004 transaction, WPN owned a 23.9% interest in Marc New Orleans, but during this restructuring its ownership interests were redistributed among the other members of Marc New Orleans and WPN was given the direct interest in Poydras. Also as a result of the restructuring, WP New Orleans ultimately received a 19.5% share of the ownership interest in the Poydras building.[38]

The entire point of the 2004 restructuring was to allow the defendants to remain partners in a lucrative asset. The entity purchasing Marc New Orleans/PTM's interests, Stewart Capital, was never offered the entire building or 100% of the ownership; it understood that 76% was the highest percentage for sale at any given time during the negotiations and closing. Once the sale from Marc New Orleans/PTM to Stewart Capital was completed, another internal shuffling occurred whereby capital contributions were recalculated based on fictitious ownership interests. Gray from Stewart Capital explained how the figures were reached. He calculated capital contributions based on the fact that 76% of the partnership was worth $5,000,000; therefore when WPN's ownership interest was diluted, its original capital contribution of $1,500,000 was decreased as well and ultimately was shown as $296,052.63. The remainder of WPN's capital contribution was shifted to WP New Orleans, which contributed no actual cash to the Poydras acquisition, but now showed a capital contribution of $1,282,894.74.

Applying these facts to the elements of unjust enrichment, it becomes all too clear that the defendants have unjustly received a tremendous benefit to the significant detriment of the debtor. All the defendants knew that Wellington, regardless of whether it was CT or VA, was being saddled with a $1,615,000 debt, that they were not personally guaranteeing the loan while the loan was allowing them to obtain an ownership interest in the Poydras building, and that they not only accepted and retained that benefit, but also restructured the ownership such that the debtor, as the owner of the property pledged for the loan, would effectively be cut off from any proceeds from the asset. Additionally, this restructuring took the proceeds from the Wellington/First Bank loan, which had been used as WPN's capital contribution and transferred that interest, on paper at least, to WP New Orleans, whose members were Byers, Merel and Clotworthy. As it

---

37. Nizan still owned 50% of WPN, but Merel was representing to parties that Byers, Merel and Clotworthy were the only owners of the 24% minority interest and eventually, when Merel and Clotworthy utilize a strawman to purchase Nizan's ownership interest in WPN from his personal bankruptcy estate, the three men will hold, and now do hold title to the 24% interest.

38. Byers argued that he could not have been unjustly enriched because he originally owned 50% of a 23.9% interest and after the 2004 transfer he only owned a 50% of a 4.5% interest. This, of course, ignores several key factors, 1) Byers was not entitled to any ownership of WPN, 2) WPN's original interest was in Marc New Orleans and not in Poydras, and 3) that Byers owned one-third of WP New Orleans, an entity that obtained a 19.5% direct ownership interest in the Poydras building as a result of the 2004 transaction.

stands currently, it would appear to a disinterested third party that Byers, Merel and Clotworthy, through WP New Orleans, contributed over $1,200,000 to their Poydras ownership, when they actually invested nothing and have amazingly increased their ownership percentage in the process to the detriment of the debtor. Additionally, because the debtor's equity was used as an investment, the defendants have received $815,970.30 [39] in distributions from the Poydras building, and payments on a contract with the majority owners of the Poydras building for management fees in the amount of $115,204.29. (Pl. Ex. 57). This Court finds there could not be a clearer example of unjust enrichment than the one created by the actions of the defendants.

The defendants again argue that because Nizan knowingly obtained the 2000 Wellington/First Bank loan, there is no fraud to punish and should be no finding for the debtor on the theories of unjust enrichment or equitable lien. *See* discussion *infra* Count VII. The defendants are attempting to add an element of fraud to the cause of unjust enrichment; that element simply does not exist, thus the argument holds no merit as it applies to this Count. The debtor has met its burden of proof as to this Count of unjust enrichment and is entitled to a judgment, jointly and severally, against Byers, Merel, Clotworthy, WPN and WP New Orleans in the amounts of $1,615,000, which is the amount of the 2000 Wellington/First Bank loan, $815,970.30, representing the distributions made on account of WPN's capital contribution from April 2000 to August 2005, and $115,204.29, the amount Byers, Merel, Clotworthy, WPN and WP New Orleans have received under the management fee

contract with the majority owners, all of which belong to the debtor, which total $2,546,174.59. The Court will not reduce the total judgment by the amounts paid on the Wellington/FB loan from 2000–02, $465,771.00, because that money only represented half of the profits received by WPN during that time frame, as testified to by Byers. An equal amount was paid to Byers, which the Court finds he is not entitled to retain, and should be turned over to the debtor; thus there is no setoff for that amount.

### Count VII—Equitable Lien

Count VII of the Complaint seeks to impose an equitable lien against WPN's and WP New Orleans' interest in the Poydras building until such time that the debtor receives $2,300,000 plus pre-judgment interest from June 1, 2005, the amount that the debtor had to pay First Bank from the defendants. The debtor alleges the imposition of the equitable lien is appropriate since the defendants knew the proceeds from the First Bank loan were being used to purchase the Poydras building and the distributions from the Poydras building were to be used to repay the loan. When the business relationship between Nizan and Byers began to break down, ownership interests were restructured such that the debtor was stripped of the distribution payments. Complaint ¶¶ 126–133.

 An equitable lien is "[a] right, not existing at law, to have specific property applied in whole or in part to the payment of a particular debt or class of debts." *Black's Law Dictionary* 539 (6th Ed.1990) (citing *Morrison Flying Service v. Deming Nat. Bank,* 404 F.2d 856, 861(10th Cir.1968)).

---

**39.** WPN received distributions from April 2000 to August 2005, in the amount of $716,520.30 and WP New Orleans received distributions from August 2004 to August 2005, in the amount of $99,450.00. (Pl. Ex. 151, p. 6, Pl. Ex. 57).

[A]n equitable lien 'does not give the plaintiff the very thing to which he was entitled ... instead, it merely grants a plaintiff a security interest in the property, which [the plaintiff] can then use to satisfy a money claim.' An equitable lien is akin to a constructive trust in that the imposition of the lien is not of particular significance in and of itself, but is 'merely a means to the end of satisfying a claim for the recovery of money.' Usually, an equitable lien is imposed in instances where unjust enrichment would otherwise result. *Wal–Mart Stores, Inc. v. Carpenter (In re Carpenter)*, 245 B.R. 39, 46 (Bankr. E.D.Va.2000) (*Carpenter I* ) (quoting *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 262–63, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999)), *aff'd.* 252 B.R. 905 (E.D.Va.2000). In order to impose an equitable lien, the plaintiff must prove that there is a specific piece of property which can be attached, that there is a debt, duty or obligation between the parties, and either implied or express intent that the property would serve as collateral for the debt. *Wal–Mart Stores, Inc. v. Carpenter*, 252 B.R. 905, 910–911 (E.D.Va.2000) (*Carpenter II* ).

 The Court has determined above that unjust enrichment occurred and the defendants cannot be allowed to retain the proceeds and benefit of the Wellington/First Bank loan while leaving the debtor to suffer the debt alone. Therefore, an equitable lien will be imposed on WPN's and WP New Orleans' interests in the Poydras building if the elements listed above can be met.

The first and third elements are simple enough; the *res* to which the equitable lien would attach is quite specific, the interests of WPN and WP New Orleans in the Poydras building, and the defendants admitted that they understood and intended that the Wellington Apartments serve as collateral for the loan. The second element is not quite so simple.

On the issue of a debt, duty or obligation between the parties, it is clear that there was no written contract between either WPN or WP New Orleans and the debtor. However, as to WPN, its entire investment in the Poydras acquisition came from the proceeds of the Wellington/First Bank loan. In fact, the proceeds of the Wellington/First Bank loan were wired directly to the title company closing the Poydras transaction at the direction of Merel. A duty, debt or obligation arose between WPN and the debtor when WPN accepted those proceeds without providing anything of equivalent value. This, coupled with the fact that WPN made payments on the loan for the first two years after it was given, evidences a debt, duty and obligation on WPN's part.

The Court is unable to find a correlating debt in regards to WP New Orleans. Granted, WP New Orleans knew about the Wellington/First Bank loan, but knowledge does not equal duty or obligation in this instance. None of WP New Orleans' capital contribution to the Poydras acquisition was derived from the Wellington/First Bank loan and it never made any of the payments on the loan.

The Court finds that the plaintiff has satisfied its burden of proof as to WPN only and that an equitable lien should be imposed upon WPN's interest in the Poydras building until Wellington receives a return of the $2,546,174.59.[40]

### Count VIII—Resulting Trust

Count VIII alleges that WPN originally obtained legal title in the Poydras building

---

**40.** See the end of Count VI for an analysis of the Court's determination of this figure.

because of the proceeds obtained from the First Bank loan, which title and interest it held in trust for Wellington. This trust was evidenced by the use of the distributions from the Poydras building by WPN to pay the debt service on the First Bank loan. The 2004 transaction occurred in violation of the duties owed by WPN to the debtor, stripping the debtor of its beneficial interest in Poydras and bestowing it upon WPN and WP New Orleans. The debtor asks that a resulting trust be placed on WPN and WP New Orleans property as a result. Complaint ¶¶ 134–138.

"[A] resulting trust arises when one person pays for property, or assumes payment of all or part of the purchase money, but has title conveyed to another with no mention of a trust in the conveyance.... [S]uch a trust arises when prior to the purchase one person binds himself to pay purchase money and stands behind his commitment, but title is conveyed to another." *Leonard v. Counts*, 221 Va. 582, 588, 272 S.E.2d 190 (1980). A resulting trust is born of the parties' intent and must not be a loan by the beneficiary or paid in the context of an agency relationship. *Morris, et al. v. Morris*, 248 Va. 590, 593, 449 S.E.2d 816 (1994). Additionally, the beneficiary must incur the debt either before or at the time of the purchase; promising to pay the debt after it has been incurred is not grounds for a resulting trust. *Salyer v. Salyer*, 216 Va. 521, 526, 219 S.E.2d 889 (1975). The plaintiff's burden of proof is by clear and convincing evidence. *Id.* at 525, 219 S.E.2d 889.

Applying these principles to the facts at hand, it is true that a resulting trust could only be imposed on WPN's interest in the Poydras building as WPN was the only entity that obtained title to the property for which the debtor paid.

At the outset, one fact leaps out, a portion of WPN's distributions from the Poydras building were used to repay the Wellington/First Bank loan for the first two years it was due. This seems to indicate that the parties did not intend that the debtor would invest in the Poydras building, but rather would be the source of loaned funds that would have to be repaid. However, Byers' own testimony was that he took half of WPN's distributions as the *self-determined* 50% owner of WPN and that the money sent to First Bank on Wellington's behalf was Nizan's 50% interest in the Poydras distribution. Byers testified that Nizan directed him to send the payments to First Bank. He further testified that when he stopped sending the distribution payments to First Bank he did so intentionally because he did not care whether the First Bank loan was repaid because he was absorbing other monetary obligations of Nizan's at the time. The evidence is clear that at no time did Byers believe he had any duty to repay the money obtained through the debtor. If Byers is to be believed, that Nizan knew about the Wellington/First Bank loan, then only in Nizan's mind was the money a loan to WPN which required repayment. The Court finds this to be the most plausible explanation. As to Byers, it is true that the debtor incurred debt, paid for property, and Byers took title to the property, but what of the intent element? According to Byers' testimony, it was the intent of Nizan, as representative of the debtor, to borrow money in the debtor's name and have title transferred to Byers through WPN, and it was clearly Byers' intent to take title to the property while the debtor paid for it. The Court finds that the plaintiff has met its burden of proof as to the imposition of a resulting trust as to Byers' interest in WPN. The trust shall attach

until such time that the debtor is repaid $2,546,174.59.

### Count IX—Constructive Trust

Count IX of the Complaint alleges that Byers, Merel, Clotworthy, WPN and WP New Orleans obtained their current interest in the Poydras building through fraud and/or improper means, by restructuring the entities involved in the Poydras acquisition such that said defendants received all the benefit while the debtor was left to bear the burden of the First Bank loan alone. Complaint ¶¶ 139–143. The debtor requests that a constructive trust be imposed upon WPN and WP New Orleans interests in the Poydras building until such time that the debtor is repaid $2,300,000 plus the fees and costs of defending against the First Bank lawsuit.

■■■ In Virginia, the law has long been that constructive trusts are created by law, "independently of the intention of the parties, to prevent fraud or injustice." *Leonard,* 221 Va. at 588–89, 272 S.E.2d 190 (citing *Porter v. Shaffer,* 147 Va. 921, 928, 133 S.E. 614 (1926)). The court in *Leonard* noted that

> '[c]onstructive trusts [are] ... *fastened upon the conscience* of him who has the legal estate, in order to prevent what otherwise *would be a fraud.* They occur not only where property has been acquired by fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit.'

*Leonard,* 221 Va. at 589, 272 S.E.2d 190 (quoting 1 *Minor on Real Property* § 462 at 616 (2d ed. Ribble 1928)), *see also Jones v. Harrison,* 250 Va. 64, 70, 458 S.E.2d 766 (1995), *Nedrich v. Jones,* 245 Va. 465, 474, 429 S.E.2d 201 (1993), *Richardson v. Richardson,* 242 Va. 242, 245,

409 S.E.2d 148 (1991). As with the resulting trust above, the plaintiff must prove that a constructive trust is warranted by clear and convincing evidence. *Leonard,* 221 Va. at 589, 272 S.E.2d 190 (citing *Sutton v. Sutton,* 194 Va. 179, 185, 72 S.E.2d 275 (1952)).

■■■ Given the Court's ruling, that the defendants would be unjustly enriched if they were allowed to retain all the benefit of the Wellington/First Bank loan while the debtor was left to pay the debt, it would be inapposite to find that a constructive trust should not be imposed. Byers, Merel and Clotworthy, through WP New Orleans, have been given credit for over $1,200,000 in capital contributions in the Poydras building as a result of the 2004 transaction, when they actually contributed no money for its purchase. They are all enjoying distributions that legally belong to the debtor. Meanwhile, the debtor has had to satisfy the First Bank loan and has nothing of value to show for it. The Court finds that the debtor has met its burden of proof and that the interests of WPN and WP New Orleans in the Poydras building shall be held in a constructive trust for the benefit of Wellington VA until such time that the debtor receives a return of the $2,546,174.59.

### Counts X & XI—Professional Negligence and Breach of Fiduciary Duty

Counts X and XI allege that an attorney-client relationship existed between the debtor and G & M, giving rise to certain duties that G & M owed to the debtor. The Counts further allege that those duties were breached when G & M took action adverse to the best interest of Wellington VA, failed to communicate with Wellington VA, did not disclose conflicts of interest to Wellington VA, and maintained representation of other clients that was directly adverse to the representation of

Wellington VA, all of which caused direct harm to the debtor. Complaint ¶¶ 144–155, 156–165. Wellington VA seeks judgment against G & M for malpractice and breach of fiduciary duty in the amount of $1,500,000 plus prejudgment interest from March 31, 2004, the date of the closing on the 2004 transaction, as that is the amount that the debtor would have been entitled to receive at the closing of that transaction but for G & M's actions.

G & M is located in the State of Illinois and governed by the laws of state, as are its attorneys. As a preliminary matter, the defendants argue that they are entitled to Judgment on Partial Findings on Counts X for two independent reasons; 1) there was no attorney-client relationship between the debtor and G & M, and 2) should the Court find there was an attorney-client relationship, the debtor failed to adduce expert testimony at trial regarding the applicable standard of care; a failure which the defendants argue is fatal to the debtor's case. The Court will address these arguments in turn.

■ A cause of action for legal malpractice requires that the debtor prove that (a) an attorney-client relationship existed giving rise to a fiduciary duty, (b) that the attorney acted or failed to act so as to breach that duty, (c) proximate cause establishing that but for the attorney's negligence, the plaintiff would have prevailed in the underlying action and (d) damages. *Serafin v. Seith,* 284 Ill.App.3d 577, 586–87, 219 Ill.Dec. 794, 672 N.E.2d 302 (1996); *see also Universal Manufacturing Co. v. Gardner, Carton & Douglas,* 207 F.Supp.2d 830, 832 (N.D.Ill.2002) ("[A] plaintiff must show the existence of an attorney-client relationship, a duty arising from that relationship, a breach of that duty, and actual damages proximately resulting from the breach."). Obviously, if

there was no attorney-client relationship then there is no cause of action.

While the debtor's argument was never quite clear, it appears that it claims that an attorney-client relationship existed between itself and Merel and G & M based on Nizan's previous employment of Merel as an attorney on matters in which Nizan knew himself to be a representative of Wellington VA. Merel and G & M argue, however, that they never knew that Wellington VA legally existed and therefore could not have been representing its interests.

■ Under Illinois law an attorney-client relationship can be formed outside of the normal course in two situations. First, such a relationship can be created during an initial meeting based on " 'the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice.' " *Herbes v. Graham,* 180 Ill.App.3d 692, 699, 129 Ill. Dec. 480, 536 N.E.2d 164 (2d Dist.1989) (quoting *Westinghouse Electric Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311, 1319 (7th Cir.1978)), *see also King v. King,* 52 Ill.App.3d 749, 10 Ill.Dec. 592, 367 N.E.2d 1358 (1977) (holding that because counsel met with client's now ex-husband prior to the parties divorce for a mere thirty minutes to discuss his marital difficulties,[1] the husband's financial situation and his plans for the future, an attorney-client relationship existed between counsel and the ex-husband that precluded counsel from representing the ex-wife two years later in a support matter against the ex-husband even though the ex-husband never hired the lawyer) (disapproved on other grounds). There is no requirement that the attorney-client relationship be "explicit or expressed and is not dependant on the amount of time the client spends with the attorney, the payment of fees or execution of a contract, the consent of the attorney,

or the actual employment of the attorney." *Herbes*, 180 Ill.App.3d at 699, 129 Ill.Dec. 480, 536 N.E.2d 164 (citing *Hughes v. Paine, Webber, Jackson & Curtis, Inc.*, 565 F.Supp. 663, 667 n. 10, 669 (N.D.Ill.1983)). However, in all the cases on this issue, the courts made it clear that the client must have made disclosures to the attorney after manifesting an intent to seek legal advice. *Herbes*, 180 Ill.App.3d at 698–99, 129 Ill.Dec. 480, 536 N.E.2d 164 (finding that counsel for the plaintiff, who was suing a township over its open-space acquisition program, was ineligible to conduct said representation because he had previously engaged in an attorney-client relationship with the township when it interviewed only him for a possible position representing the township in the same program, evidencing the township's intent to hire him and therefore speak freely regarding the program), *Hughes*, 565 F.Supp. at 670 (holding that in order to determine whether disqualification of plaintiff's attorney is appropriate because of a previous attorney-client relationship he had with the defendant, the court must determine whether confidential information was passed from client to attorney), *Int'l. Paper Co. v. Lloyd Manufacturing Co., Inc.*, 555 F.Supp. 125, 132 (N.D.Ill. 1982) ("[A]n attorney-client relationship exists 'when the lay party submits confidential information to the law party with *reasonable* expectation that the latter is acting as the former's attorney ... (quoting *Westinghouse Elec. Corp.*, 580 F.2d at 1321)) (emphasis added). The focus is on the client's belief and not that of the attorney. *Herbes*, 180 Ill.App.3d at 699, 129 Ill.Dec. 480, 536 N.E.2d 164.

▪ Secondly, an attorney-client relationship is formed when the representation was undertaken by the parties with the primary or direct intent to benefit a non-client third party. *Pelham v. Griesheim-*

*er*, 92 Ill.2d 13, 20–21, 64 Ill.Dec. 544, 440 N.E.2d 96 (1982). Such an attorney-client relationship is more apt to be found by courts when the parties are conducting business that is non-adversarial in nature, *Id.* at 22, 64 Ill.Dec. 544, 440 N.E.2d 96; otherwise the attorney is placed "in a position of conflicting interests." *Felty v. Hartweg*, 169 Ill.App.3d 406, 410, 119 Ill. Dec. 799, 523 N.E.2d 555 (4th Dist.1988).

However, even if no attorney-client relationship exists, Illinois attorneys are still subject to the Illinois Code and all the responsibilities assigned them there under. *In re Imming*, 131 Ill.2d 239, 255, 137 Ill.Dec. 62, 545 N.E.2d 715 (1989). The *Imming* court found that "[a]n attorney may be subject to discipline for conduct outside his professional capacity for any act that evidences an absence of professional or personal honesty that renders him unworthy of public confidence." *Id.* (citing *In re Pappas*, 159 Ariz. 516, 521, 768 P.2d 1161 (1988)) (" '[A]lthough [the attorney] may [have acted] as an investment advisor or otherwise, [he] was "bound by the ethical requirements of [the legal] profession, and he may not defend his actions by contending that he was not engaged in some other kind of professional activity." ' "). The Illinois Supreme Court has noted that following the rules found in the Code of Professional Responsibility is not discretionary; "its rules are mandatory rules of conduct. An attorney may not unilaterally decide that the rules are inapplicable because, for example, the parties he is dealing with are also friends and business partners." *In re Demuth*, 126 Ill.2d 1, 13, 127 Ill.Dec. 785, 533 N.E.2d 867 (1988).

We note that both the *Imming* and *Demuth* courts were handling appeals from findings of attorney review boards in the state, which seems to indicate that the appropriate recourse here, should the

Court find impropriety on the part of Merel and/or G & M outside of an attorney-client relationship, is to report the inappropriate behavior to the Illinois State Bar to mete out any discipline in its discretion. So, back to the ultimate question: was there an attorney-client relationship between the debtor and Merel and/or G & M, and if so, was there a breach of fiduciary duty?

■ No evidence was ever presented of an explicit attorney-client relationship between the debtor and Merel and/or G & M. The evidence in this case shows that Merel and G & M represented Nizan, and his entities, Alderwood Apartments, Midtown Apartments, Stonehouse Apartments, Lakeland Apartments and Arbor Village, as early as 1999–2000. (Tr. p. 149–50). It also shows that Nizan, who was the only principle of the debtor interacting with Merel and/or G & M, believed Merel and/or G & M was representing him and his entities in all the renewals of the loans he had with First Bank in June 2001 and March 2002. (Tr. p. 151). However, the Court finds that it is not possible that one of those entities Merel or G & M were representing could have been Wellington VA. Nizan testified that he did not know about the second mortgage on Wellington Apartments until mid–2002, after both restructurings had taken place; therefore, Nizan would never have manifested an intent to Merel/G & M that he was seeking legal advice on Wellington VA's behalf, as required by the case law. Thus, there was no way that Nizan could have had any belief, reasonable or not, that Merel and/or G & M was representing the debtor, undermining Nizan's entire argument on this point.

Likewise, the Court also finds there was no attorney-client relationship based on theory of Wellington VA as a third-party beneficiary to the contracted legal services. To find such an arrangement, the evidence would have to have shown that Merel/G & M contracted with another party for legal services with the intent of both parties to benefit the debtor. The evidence was to the contrary. No one contracted with Merel/G & M for legal services with the expressed intent to benefit the debtor. As discussed above, Nizan's own testimony nullifies this argument; he could not have contracted with Merel/G & M for legal services regarding these loans to benefit the debtor when he testified that he did not know about the loans until mid–2002, which was several months after the final restructuring. Additionally, Merel testified he did not learn of the existence of Wellington VA until the commencement of the instant case. While debtor's counsel did show that Mike Lucash, who worked at Wexford Trust at the time, learned of the existence of Wellington VA and passed that information along to First Bank on May 9, 2002, (Pl. Ex. 41), there was no evidence that Merel or anyone at his firm learned about that information. (Tr. p. 372–73). The plaintiff has not proven an attorney-client relationship between the debtor and Merel and/or G & M based on the theory of third party benefit.

■ During the trial the debtor continued to make the point that Merel and/or G & M were acting on behalf of the party they thought actually owned Wellington Apartments during both loan restructures, and because the true owner was the debtor, Merel/G & M were therefore actually representing the debtor. The Court finds this theory of misplaced representation too far removed to be plausible and there does not appear to be any case law to support such a claim. An attorney cannot represent someone that he does not know exists. Merel testified that he believed that Wellington CT, who was listed as the borrower on the 2000 First Bank loan, was the own-

er of the apartment complex and, again, did not learn about Wellington VA until he was served with papers on this lawsuit. There was no evidence to prove otherwise. The same is true for both the 2001 modification and the 2002 restructuring. While the Court agrees that Merel/G & M handled the entire matter in a sloppy manner (*e.g.*, not requiring a proof of ownership, not keeping records, not maintaining files), that is no basis for substituting one party in for another and creating an attorney-client relationship. Without the foundation of an attorney-client relationship between the debtor and Merel/G & M, no negligence action can stand against G & M. Accordingly, Judgment on Partial Findings on behalf of the defendants Merel and G & M is granted.

However, the Court finds the actions of Merel and G & M to be deplorable conduct for persons in the legal profession. While the Court is unable to find an attorney-client relationship between the debtor and Merel/G & M, that in no way means that they did not breach duties that they owed to other clients, but the parties this Court believes may have been aggrieved and those issues are not before this Court and therefore are not addressed here.

This Court is not left completely powerless regarding the behavior of Merel and G & M where this case is concerned. We feel that Merel and G & M displayed not only terrible judgment in their interactions with clients, but also committed potentially sanctionable actions by blurring the boundaries between business partner and client, by obtaining percentages of ownership in clients' real estate transactions, and

by misleading a trustee in a bankruptcy proceeding in an effort to obtain property of the debtor for their own benefit. Given the holding in *Imming,* that even though no attorney-client relationship exists, attorneys are still expected to meet the minimum ethical standards set forth by the Illinois Professional Rules of Professional Responsibility, this Court will forward a copy of this opinion along with a letter to the Illinois State Bar with a recommendation that a full investigation ensue.

### Indemnity Action

Finally, the defendants in their response to the debtor's Finding of Facts and Conclusions of Law claim that the Complaint, based upon paragraph 30,[41] is simply an indemnification action. While the Court might agree that indemnity is an additional cause of action being pursued by the debtor, viewing the Complaint solely as an indemnity claim discounts the right of a debtor in possession to act as the trustee pursuant to 11 U.S.C. § 1107, and pursue the causes of action discussed above. Whether the debtor has proven an indemnity action is of no consequence however, given that the debtor is successful on some of the previous Counts. Accordingly, the issue is neither dispositive nor decided here.

### CONCLUSION

We have determined that the following resolution of the issues presented is appropriate under the facts of this case and the law as applied to those facts:

1. *Count I*—The debtor has not met its burden of proof that a conspiracy

41. Paragraph 30 states:
The Debtor is currently litigating the validity, priority and extent of the lien and claim of First Bank against the Debtor arising from the First Bank Loan [a defined term in the Complaint]. The Debtor reserves all rights to continue to dispute the validity of

that obligation but is filing this lawsuit out of an abundance of caution, in the event that the Debtor is obligated to repay or otherwise utilize its resources to satisfy the First Bank Loan.
Complaint ¶ 30.

existed to willfully injure Wellington VA; therefore relief under this Count is **DENIED.**

2. *Count II*—The debtor has met its burden of proof that an actual fraudulent transfer of the debtor's assets occurred at the hands of Byers, Merel, Clotworthy, WPN and WP New Orleans; therefore relief under this Count is **GRANTED** and those defendants are found liable, jointly and severally, to the debtor in the amount of $1,615,000.

3. *Count III*—The debtor has met its burden of proof that a constructive fraudulent transfer of the debtor's assets has occurred at the hands of Byers and WPN; therefore relief under this Count is **GRANTED** and those defendants are found liable, jointly and severally, to the debtor in the amount of $1,615,000.

4. *Count IV*—The debtor has met its burden of proof that Byers, Merel, Clotworthy, WPN and WP New Orleans effectuated a post-petition transfer of the debtor's asset; therefore relief under this Count is **GRANTED** and those defendants are found liable, jointly and severally, to the debtor in the amount of $1,615,000.

5. *Count V*—The debtor has not met its burden of proof that the defendants violated the automatic stay created by the debtor's bankruptcy filing by further transferring the debtor's assets post-petition; therefore relief under this Count is **DENIED.**

6. *Count VI*—The debtor has met its burden of proof that unjust enrichment has occurred to the benefit of Byers, Merel, Clotworthy, WPN and WP New Orleans and the detriment of the debtor; therefore relief under this Count is **GRANTED** and those defendants are found liable, jointly and severally, to the debtor in the amount of $1,615,000, the amount of the Wellington/First Bank loan, $716,520.30, the amount of distributions paid to WPN on account of its ownership interest in the Poydras building from April 2000 to August 2005, $99,450.00, the amount of the distributions paid to WP New Orleans on account of its ownership interest in the Poydras building from August 2004 to August 2005, and $115,204.29, the amount paid to the defendants based on the side agreement with the majority owner for management fees of the Poydras building from August 2004 to August 2005. The total damages awarded to the debtor against Byers, Merel, Clotworthy, WPN and WP New Orleans, jointly and severally, pursuant to Count VI is $2,546,174.59, together with interest thereon from the date of this judgment order until paid.

7. *Count VII*—The debtor has met its burden of proof that an equitable lien should be imposed WPN's interest in the Poydras building until $2,546,174.59, plus interest, is repaid to the debtor; therefore relief under this Count is **GRANTED** as to WPN only.

8. *Count VIII*—The debtor has met its burden of proof that a resulting trust should be imposed upon Byers' interest in WPN until $2,546,174.59, plus interest, is repaid to the debtor; therefore relief under this Count is **GRANTED** as to Byers only.

9. *Count IX*—The debtor has met its burden of proof that a constructive trust should be imposed upon WPN's and WP New Orleans' inter-

ests in the Poydras building until $2,546,174.59, plus interest, is repaid to the debtor; therefore relief under this Count is **GRANTED** as to WPN and WP New Orleans.

10. *Count X*—The debtor has not met its burden of proof that an attorney-client relationship existed between the debtor and Merel and/or G & M; therefore no legal malpractice can be found and relief under this Count is **DENIED.**

11. *Count XI*—The debtor has not met its burden of proof that an attorney-client relationship existed between the debtor and Merel and/or G & M; therefore no breach of fiduciary duty can be found and relief under this Count is **DENIED.**

12. The Court finds that Merel and/or G & M engaged in inappropriate activities outside of an attorney-client relationship, which may be sanctionable under Illinois law, but are not dealt with by the Court in these proceedings for the reasons previously stated.

13. The judgments awarded to the debtor against the specified defendants, jointly and severally, are not intended to be cumulative, and therefore, those defendants are jointly and severally liable to the debtor and are ordered to pay to the debtor a total amount of $2,546,174.59, together with interest thereon from the date of the judgment until paid, which represents the amount the debtor's loan from First Bank, the total distributions from WPN's interest in the Poydras building prior to the 2004 transaction, WPN's and WP New Orleans distributions since the 2004 transaction, and the defendants'

share of the management fees as a result of the side agreement negotiated with the majority owner on behalf of WPN and WP New Orleans.

14. A hearing to resolve WPN's pending Motion for Reconsideration of sanctions imposed against it for failure to answer discovery will be scheduled by the Court pursuant to the order entered on February 17, 2006.

15. Finally, the Court has preserved and reserved the question of distributions from the Poydras Building, if any could have been made by its managing director, on account of the interests of WPN and WP New Orleans in the Poydras Building. The Court indicated at the end of the trial that it would hear the concerns of Poydras, LLC, about the remedies fashioned by the Court herein and its concerns about the distributions that have been made or might have been made to WPN and/or WP New Orleans since March 8, 2006. There also remains the issue for Poydras, LLC, about all future distributions on account of the interests of WPN and WP New Orleans, all of which issues will dealt with by the Court at a hearing to be set for that purpose as soon as possible, in light of the rulings of the Court in this Memorandum Opinion and Order.

**IT IS SO ORDERED.**